STATE OF NEBRASKA, APPELLEE, V. DOUGLAS WORLEY,
APPELLANT.

132 N. W. 2d 764

Filed January 29, 1965.    No. 35789.

Young, Denenberg & Mullery, for appellant.

Clarence A. H. Meyer, Attorney General, and Chauncey C. Sheldon, for appellee.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, and BROWER, JJ., and POLLOCK and SIDNER, District Judges.

WHITE, C. J.

On prosecution for second degree murder, the court submitted the issues of second degree murder and man-

slaughter to the jury. A conviction for manslaughter resulted and the defendant appeals.

The deceased, Ralph Gomez, died of multiple gunshot wounds in the chest inflicted about 5 p.m., April 21, 1963, in the living room of the residence of Lucille Hembertt at 1436 South Sixteenth Street, Omaha, Nebraska.

Since the fall of 1962 the defendant, single, had a continuing paramour relationship with Lucy (Lucille Hembertt). On the morning of April 21, 1963, at her residence, the defendant, Lucy, Joe Marino, Lucy's brother, and the deceased, Ralph Gomez, cooked a late breakfast or lunch and started drinking. The defendant said he consumed a fifth of whiskey during the day. Gomez was a former friend of Lucy's whom the defendant had met only once before at a tavern 3 or 4 months before. There is no evidence of any argument or trouble between the defendant and Gomez up until the time they left Lucy's house sometime in the afternoon. The defendant, Lucy, and Gomez left in Gomez' car, drove around, and then drove to an address "way out north" to visit Gomez' girl friend. Murdock Platner, an Omaha police officer, testified that the defendant told him, in a conversation the next morning, of the events preceding the shooting of Gomez. This version is substantially as follows: That Gomez, Lucy, and the defendant went to Gomez' girl friend's house who lived "way out north." At first defendant waited in the car, then went in the house, and after about 10 minutes wanted to leave. Gomez didn't want to leave but offered to drive them back home and then he (Gomez) was going to come back. The defendant said it was too far and he walked out. After awhile Lucy and Gomez drove up in the car and asked him to get in but he just kept on walking. He then took a cab to Lucy's house and laid down on the bed. He got up and took a pistol from the closet shelf, loaded it, and fired at some figurines above the window in the bedroom. He was reloading, or going to reload, the gun when he heard the doorbell ring. It was Gomez and

Lucy. He asked where they had been and said that they took long enough to get home. He sat down on the divan and was fooling with the gun. He said he thought it was jammed and that he was trying to fix it. He said he was mad, was fooling with the gun, looked up, and Gomez was standing right in front of him. Gomez came toward him, took a step toward him, and raised his hands. He said he turned around with the gun and it went off. He said he jumped off the divan, the gun went off again, and Gomez slumped down on the floor. He then called the police and an ambulance. Defendant said the gun fired twice.

The defendant's testimony on trial gave nearly the same version of the circumstances up until the time the doorbell rang when Lucy and Gomez were returning. He testified on trial substantially as follows: He remembers hearing the doorbell ring. After the doorbell rang, he got up and left the bedroom, laid the gun either on the coffee table next to the door or on the sofa in the front room, and then opened the door. Lucy and Gomez were at the front door. He didn't see Joe Marino anywhere around at that time. Gomez and Lucy came into the house, and defendant went back into the bedroom and laid down on the bed. The next thing he remembers was hearing a couple of shots—he thinks the gun fired twice and he got up and went into the living room. He saw Gomez lying on the floor in the front room and Lucy was standing above him crying. He observed the gun on the floor next to Gomez, ran over and picked the gun up, turned Gomez over a little to see what was the matter, and noticed blood running down his arm. He went to the phone and called for an ambulance and eventually the police came. He was holding the gun in his hand when the two armed officers came in the house so he ran into the bedroom.

Rodman and Sorys, two Omaha police officers, arrived at the residence in response to defendant's call. This was at about 5:30 p.m. They saw a man lying face

down in the center of the living room floor, saw Lucy standing next to the body, and saw the back of a man who ran into the bedroom to the northwest of the living room. Rodman ordered the defendant out of the bedroom, at first he refused to come out, then threw the gun out of the bedroom, and came out with his hands up. Another police officer, Hauger, testified that the defendant said in the living room as follows: "* * * she had nothing to do with it. He says, 'I did it.'" Police officer Mitchell corroborated this statement. Rodman and Sorys testified as to admissions of the defendant while they were taking him to the police station. Cartridge cases found next to Gomez' body were identified as having been fired from the gun that defendant had thrown out the door of the bedroom to the police officers.

The jury verdict acquitted the defendant of second degree murder and convicted him of the lesser included offense of manslaughter. He now makes the rather unique and novel contention that he was prejudiced because of the court's submission of the issue of manslaughter to the jury. He says he was either guilty of second degree murder or innocent. It is the duty of the court, in a homicide case, to instruct only on those degrees of homicide as find support in the evidence. Williams v. State, 103 Neb. 710, 174 N. W. 302; Garcia v. State, 159 Neb. 571, 68 N. W. 2d 151. Manslaughter is the killing of another without malice, either upon a sudden quarrel or unintentionally while the slayer is in the commission of some unlawful act. § 28-403, R. R. S. 1943. Defendant told police officer Platner that after he let Gomez and Lucy in the door that he asked, "Where you guys been, sure took you long enough to get home, * * *"; that he went over to the divan and sat down; that he was fooling with the gun, thought it was jammed and was trying to fix it; that he had some words with them; that he couldn't remember the words because he was mad; that Lucy walked past him into the bedroom; that he looked up, Gomez was standing in front of him,

took a step toward him, and raised his hands; that at that time he turned around with the gun and it went off; and that when he jumped off the divan it went off again and Gomez started slumping down and falling to the floor. We believe this evidence alone was sufficient for the jury to reach a conclusion that the killing occurred upon a sudden quarrel and in the heat of passion. The lack of intent, as well as intent itself, is a matter peculiarly within the jury's province. Its presence or absence usually must be inferred from all the circumstances. It is seldom susceptible to direct proof.

The court also instructed the jury that the defendant could be found guilty of manslaughter if he shot and killed Gomez while in the commission of an unlawful act of assault and battery. From the same circumstances set out above, the jury possibly could have found that the defendant assaulted Gomez with the weapon in his hand without necessarily rendering the commission of the homicide intentional. Malice, intent, or purpose may be inferred from the shooting of another person with a deadly weapon. But not every assault with a deadly weapon in hand is necessarily conclusive proof of intent or a design to effect death. To come within the provisions of the manslaughter statute, the killing must not have been intentional or with a design to effect death. See, 40 C. J. S., Homicide, § 67, p. 933. The evidence in this case would clearly sustain a verdict of second degree murder. But, this court cannot say as a matter of law, under the circumstances, that intent or a design on the part of the defendant to effect death existed. The question of whether he was engaged in an assault on the deceased, and whether it was done with the intent to kill, is peculiarly within the province of the jury. And, we fail to see how the defendant was prejudiced when the jury was given the opportunity to find that the deceased was killed by the discharge of the defendant's gun but without the intent or design to kill.

Police officers, Rodman and Sorys, arrived at the

scene about 5:30 p.m. When they came into the living room, the defendant was going into the bedroom to the northwest. Lucy was standing by the body in the living room. Officer Rodman was permitted to testify, over objection that it was hearsay, as follows: "Q. What did you observe about her? A. Well, she was standing there crying and I asked her what happened and she in turn says—Mr. Denenberg: Just a minute, object to any hearsay testimony. The Court: Overruled. Q. You may answer. A. I says, 'What happened?' and she says, 'He is in the bedroom.' At this time, my partner, I said to him, it was either the man who did this or the man who shot him, and she says, 'Yes,' and she pointed to the bedroom which I had seen the man running in."

At the time this statement was made defendant was in the bedroom to the northwest. The State admits that this testimony was hearsay, but says it is admissible as an admission against interest. An incriminating statement or accusation, made in the presence of accused, which he has the opportunity to deny, but does not, may be admissible as an exception to the hearsay rule. Pierce v. State, 173 Neb. 319, 113 N. W. 2d 333; Oakley v. State, 125 Tex. Cr. App. 258, 68 S. W. 2d 204. See, 40 C. J. S., Homicide, § 252c, p. 1199. But, there is no proof that the defendant heard this oral statement. We cannot infer it from his presence in an adjoining room. The distance between the parties, the direction Lucy was facing when she made the purported statement, and whether the door to the bedroom was closed or not are matters not established by the evidence. Lucy did not testify and the defendant was not cross-examined as to whether he heard this statement. We can only conjecture that he heard it and that therefore it was made in his presence. It was clearly inadmissible because of lack of sufficient foundation. Nor is it admissible as part of the res gestae. The statement was made after the police officers arrived. There was ample opportunity for reflection and formulation of the

content of the statement. The statement could not be considered as the act speaking through the person's words. The elements of lack of premeditation and spontaneity are absent. See Gain v. Drennen, 160 Neb. 263, 69 N. W. 2d 916. We conclude that the admission of this testimony was error requiring reversal of this judgment.

Defendant, citing Escobedo v. Illinois (June 22, 1964), 278 U. S. 478, 84 S. Ct. 1758, 12 L. Ed. 2d 977, insists the conversation with police officer Platner the next morning, some 14 to 16 hours after the arrest, is inadmissible. He doesn't assert the admissions in this conversation were involuntary, but claims at this time he should have been advised of the right to assistance of counsel and of his right to remain silent. In Escobedo the "critical question" was whether, *under the circumstances, the refusal by the police to honor petitioner's request to consult with his lawyer* during the course of an interrogation," constituted a denial of the constitutional right of counsel. (Emphasis supplied.) The circumstances were entirely different in Escobedo. Among other differences, in Escobedo, defendant had a lawyer and made repeated requests to consult him. The lawyer was present on the premises and made repeated requests to consult his client, all of which requests were denied. None of these controlling elements, present in Escobedo, are present in this case. It seems that the court in Escobedo emphasized the offensiveness of the aggregate particular circumstances as compelling the court's holding. Escobedo does not reach the present case. To hold otherwise would deny the State the right and opportunity to properly investigate the circumstances of a homicidal killing. We hold that there was no error in the admission of this testimony.

For the reasons given, the judgment is reversed and the cause remanded for a new trial on the original information for second degree murder.

REVERSED AND REMANDED.