STATE OF NEBRASKA, APPELLEE, v. RONALD EUGENE KIRBY, APPELLANT.

175 N. W. 2d 87

Filed March 6, 1970. No. 37232.

A. Q. Wolf and Bennett G. Hornstein, for appellant.

Clarence A. H. Meyer, Attorney General, and James J. Duggan, for appellee.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

SPENCER, J.

Defendant was convicted of the murder of Gilbert Arthur Batten, Jr. He was sentenced to life imprisonment and has perfected an appeal to this court.

The murder occurred shortly after 3 a.m., on September 20, 1968, at 3724 Ohio Street, in Omaha, Douglas County, Nebraska. Defendant had been to the premises on two other occasions the previous evening, looking for a Judy Dunbar. The premises in question were occupied by James Lynch with his four minor children. Defendant appeared at the premises about 7 p.m., on September 19, in the company of a tall Indian later identified as Robert Walker, and a Donna Marshall. He was carrying a .22 caliber survival rifle. On this occasion he did not enter the house but asked Lynch if he had been dating Judy Dunbar, and when Lynch told him he had defendant told Lynch to stay away from her and Lynch said he would. Defendant shot two or three times at a brush pile and Walker shot at a rabbit. They were at the premises for approximately 15 or 20 minutes. On that occasion Donna Husky, her child, and Eugene Phillips, all of whom were also living

on the premises, were present, as well as the deceased who lived in the neighborhood, and Judy Warner who lived elsewhere.

Defendant returned to the premises at 11:30 p.m., on September 19, 1968, this time with a girl named Pam or Patty. He was admitted to the premises by the deceased. He was still carrying the gun he had on his previous visit. Lynch was not home. Judy Warner, Eugene Phillips, Donna Husky, deceased, and Harriet Taylor, a neighbor, were the only ones present other than the children, who were asleep. Deceased asked Judy Warner to get defendant a beer, and when she did not respond quickly enough defendant said, "* * * when he tells them to do something they do it," and ordered the girl with him to get down on her knees, which she did. Defendant was dissatisfied with the brand of beer offered, and left within 15 minutes. When he left he said he was going to see if he could find Judy Dunbar at her home. If not, he would be back.

Subsequently, Lynch returned home about 12 midnight and went downstairs to bed. Defendant returned to the premises about 3 a.m., on September 20, 1968. Deceased and Judy Warner were sitting on a couch in the parlor. Defendant asked for James Lynch, and when he was told Lynch was asleep in the basement he asked how to get to the basement, and forced the deceased, who opened the door, to show him the way. Defendant still had the gun in his hand. He was accompanied on this occasion by Walker and a man with long hair, wearing a "Hell's Angels cut-away jacket," who was later identified as Orval Hinz.

According to defendant's testimony, he told Walker to go around a screen in the basement and to get Lynch. Lynch testified that he was dragged out of bed by Walker; that when he was pulled around the screen, the deceased was on his knees; that someone hit him with a gun; and that's all he remembers. Lynch heard a shot, and when he came to, the deceased was lying

there in a pool of blood. Lynch got to his feet and pushed his three boys, who were also sleeping in the basement, out of the basement window, followed them, and they went next door until the police arrived.

Defendant testified that he told deceased to get down on the floor; that Walker put Lynch beside him; and roughed him up with the gun stock which had been detached from the gun. Defendant held the rest of the gun in his hand, with the trigger cocked. Deceased was 3 or 4 feet directly in front of defendant, on his knees. Defendant, who was left-handed, had the gun in his left hand, with his finger on the trigger which had to be squeezed or pulled to fire the gun. Defendant admitted his finger squeezed or pulled the trigger. Defendant's explanation of what happened is as follows: "What happened? Well, Robert was slapping on the guy or whatever he was doing. He turned around and got a little close. He said, 'Watch me. Don't point that thing,' and he pushed both hands on the barrel and the gun goes off. He said, 'What happened?' He said, 'What did you do?' I said, 'Do nothing.' I said, 'The thing went off and Batten fell over.'" Defendant testified that things then got hectic. They looked at the guy that got shot and blood was gushing, and they broke for the stairs. Defendant thought that Hinz was several feet behind him, back by the stairs, when all the activity was going on. He doesn't recall what happened afterwards, but they left the premises.

Judy Warner testified that when defendant's party arrived at 3 a.m., she was sitting upstairs on the couch with deceased. When defendant ordered deceased to go to the basement, she awakened Eugene Phillips and Donna Husky who were sleeping in a bedroom off the parlor, and went to the basement. Defendant turned toward her, pointing the gun. Lynch was on his knees alongside deceased. Defendant had the barrel and the trigger to the gun pointed at deceased. The stock was not on it. Walker had the stock, and hit Lynch on the

face with it. She then went to the three Lynch boys
who were sleeping in beds behind the plastic curtain.
The fourth Lynch child was asleep upstairs in the back
bedroom. At this time Hinz stood over by the steps,
holding a piece of iron pipe. She could only see shadows
after she went behind the curtain. After she had com-
forted the children she started to go upstairs, and Hinz
said he would kill her if she moved, so she went back
to the children. She then heard a shot and started
screaming. When she came out from behind the cur-
tain, defendant still had the gun and deceased was
lying on the floor. Lynch was leaning back, half
stunned. She stood there, and the defendant and the
other two men ran upstairs. She went to the deceased.
He was bleeding severely from his head. She ran up the
steps to the kitchen and defendant, who was coming out
of the front bedroom, turned on her and hit her with
the gun on her left cheek. She fell backwards and
returned to the basement. Lynch was then pushing the
children out the window. She ran back upstairs to call
the rescue squad for deceased.

Phillips testified that Judy Warner awakened him at
about 3 a.m., and when he heard the shot he started
looking for a shotgun he knew was upstairs and started
to load it, when someone swung at him with a rifle.
Someone grabbed the person who swung at him, and said,
" 'Let's get out of here.' "

Donna Husky testified that defendant had the barrel
of the gun in his hand when he came into her bedroom
upstairs. She had heard the gunshot before she saw
the defendant with the barrel. Walker had the stock
of the gun at this time.

A pathologist testified that the bullet wound was
to the right, just below the bridge of the nose, and that
he removed a number of particles of lead slug, primarily
in the right cerebral hemisphere of the brain. He
testified it was the bullet which caused the death, and

from the absence of powder burns the muzzle of the gun must have been at least 2 feet away.

Judy Dunbar testified that she had been going with defendant, but had not seen him for over a month. He had beat her up in August with his fists, and had struck her with a gun. Subsequently she had been out with deceased, and had dated Lynch a couple of times. She had been at the Lynch home twice September 19, 1968. On the first occasion Lynch had taken her to driving school, where he left her. She returned to the Lynch home after driving school, and Lynch then took her to a friend's and later to her home. Her brother-in-law then took her to her brother's home in South Omaha, where she spent the night.

About 11 o'clock in the evening of September 19, 1968, defendant was at the home of Judy Dunbar's parents, inquiring for her. The testimony is that he broke the lock on the outer door and entered the house. He was holding a gun. He was there for 6 or 7 minutes.

Defendant was permitted to file a supplemental brief herein. The nature of it is such that we would ordinarily strike it as scandalous and profane. In it defendant attempts to discredit his counsel and the trial court, both of whom did everything possible to protect his rights. Those allegations will be answered herein.

Defendant complains that his counsel was ineffective, and that court-appointed counsel must render effective assistance at every stage of the proceedings. There is no merit to defendant's contention. Defendant was guilty of a brutal murder under circumstances which in the hands of less able counsel could have resulted in the death penalty. He was represented by a very competent member of the public defender's staff. The record demonstrates a conscientious effort on the part of counsel to protect defendant's rights at every stage. Counsel presented an adequate defense, worthy of a most conscientious defense attorney. It is of more than passing interest that after 4 days of trial, when the trial

judge, out of an abundance of caution, turned to the defendant to explain what his attorney was doing in agreeing to a stipulation, defendant cut him short and said, "Whatever he decides is good enough."

The first assignment of error in the original brief is as follows: "The District Court abused its discretion and committed reversible error in denying defendant's pretrial motions for a continuance of his trial, to sequester prospective jurors during their voir dire examination, and regular jurors during trial." Defendant and his counsel were not in agreement on the matter of a continuance. Defendant's counsel sought to postpone the trial until he felt the effects of the publicity of the brutal slaying had sufficiently diminished in the public mind that a fair and impartial jury could be obtained. Defendant was demanding a speedy trial and a letter to the presiding judge resulted in a special hearing on the question on December 27, 1968. On that occasion defendant requested the removal of his counsel and demanded the right to try his own case. The court granted defendant's request for a speedy trial and scheduled the trial for January 6, 1969. Defendant's conduct on this occasion amply demonstrated his need for competent counsel. The trial court directed counsel to remain in the case.

The question of sequestering prospective jurors during their voir dire examination was presented to this court in State v. Fiegl, 184 Neb. 704, 171 N. W. 2d 643. In that case we held: "A party in the selection of a jury ordinarily has no right to examine a juror out of the presence of all other jurors."

On the question of the court permitting the jury to separate during the course of the trial, we observe that nowhere in the brief nor in this record has there been any showing of prejudice because the trial judge allowed it to separate during the trial. In Smith v. State, 111 Neb. 432, 196 N. W. 633, we held: "Whether, during the trial of a criminal case, the jury shall be allowed to

separate, after being duly cautioned, is a matter for the discretion of the trial court, and the exercise of such discretion, unless abuse or prejudice is shown, furnishes no ground for error."

In Wesley v. State, 112 Neb. 360, 199 N. W. 719, we held: "On the trial of one charged with murder, the court may in its discretion, during the progress of the trial and before its final submission, permit the jury to separate during the several recesses of the court and go to their respective homes at the close of a day's service in the court, when the jury are properly admonished as provided in section 10150, Comp. St. 1922."

In the present case the jury was adequately admonished on every occasion of separation, and there is nothing in this record to indicate that the defendant was prejudiced in any manner because the jurors were permitted to separate and go to their respective homes at the close of a day's service in the courtroom.

The complete voir dire examination was transcribed and is a part of the record herein. There were no restrictions of any nature on the examination of the prospective jurors. Every challenge for cause was sustained, so every juror selected had specifically been passed for cause. It is also to be noted that defendant did not object in any instance to the excusing of any juror who was challenged for cause by the State. In fact, he specifically consented to their exclusion. Defendant's counsel, upon questioning, did not find one juror who ultimately was chosen as a juror who could remember any specific facts of the case that he had read or heard, or who had formed any opinion of the guilt or innocence of the defendant or who did not feel that he could be fair and impartial to both sides. Two alternate jurors were chosen. The defense waived its last peremptory challenge in this instance. One of the alternate jurors ultimately replaced a juror who was excused because of the illness of his mother in an-

other state. Both the defendant and the State agreed to the replacement.

Defendant, in his supplemental brief, under an assignment of error titled "Conduct of the Trial Judge." states: "In the Appellants Brief filed by the court Appointed Attorney, it is felt that the Attorney did fairly well presenting the issue of adverse publicity, however the Appellant feels that more should be added and the case Appellant feels that should have been further and more concisely presented is Sheppard v. Maxwell, 384 U. S. 333, Where in the Supreme Court of the United States in reversing the Conviction of Sheppard stated. 'The Carnival atmosphere at trial could easily have been avoided since the Courtroom and Courthouse premises are subject to the control of the Court.' "

Defendant quotes extensively from Sheppard v. Maxwell, 384 U. S. 333, 86 S. Ct. 1507, 16 L. Ed. 2d 600, but that case has absolutely no relevance herein. The record indicates that the trial judge made every attempt to protect the rights of the defendant. If there was any carnival atmosphere at the trial, it certainly is not apparent from anything in this record. Defendant's counsel makes no such claim, and to a direct question on argument before this court stated that he could not make that complaint.

While the nature of the case was such that it would result in considerable publicity, the pretrial exhibit describing the incident and giving information on the defendant cannot be said to have prejudiced the defendant on his trial herein. The record is clear that none of the jurors who were ultimately chosen to serve on the jury to try defendant were influenced by the publicity or had formed any opinion therefrom. There is no merit to defendant's contention.

Defendant in his supplemental brief further urges that the court erred in failing to reduce the charge against him from murder in the first degree to a charge of manslaughter. The obvious answer to this allegation is that

it is hard to visualize a more cold-blooded murder than the one of which defendant was convicted. The gun he was carrying had a faulty safety. He testified he kept the gun loaded. He had the trigger cocked when he pushed the deceased to his knees; had the gun pointed at the head of the deceased; and admits that it was his finger which squeezed or pulled the trigger. In any event, the jury was instructed on manslaughter as well as on first- and second-degree murder.

Defendant in his supplemental brief also complains that he was denied a fair and impartial trial by excluding prospective jurors who were opposed to the death penalty. The death penalty was not imposed herein. The jury recommended that defendant be sentenced to life imprisonment. Sixteen of the prospective jurors were excused for cause, because they were opposed to the death penalty. However, these prospective jurors were not excluded until the trial court and the examining attorneys had established that they were irrevocably opposed to capital punishment and that they could not subordinate their personal views to what they perceived to be their duty to abide by their oaths as jurors and to obey the law of the state. One who cannot subordinate his personal views to what he perceives to be his duty to abide by his oath as a juror and to obey the law of the state must be excused for cause. On the record made, the jurors were properly excluded. As suggested heretofore, defendant's counsel consented to their exclusion.

The second assignment of error in the original brief is as follows: "The District Court committed reversible error in first overruling a defense objection to testimony before the jury by a police officer that the defendant had invoked his rights to counsel and silence after first being advised of them by police, and the Court compounded this error by denying a defense motion for mistrial when the same officer again testified to a subse-

quent repeated refusal of the defendant to respond to police interrogation."

The factual situation is important to understand the reason the prosecution thought it necessary to adduce this testimony. It was foundational to a subsequent statement by the defendant regarding the murder weapon. The officer in question gave the appellant the Miranda warnings at the federal building when he was released by the federal authorities to the State. When defendant was asked if he was willing to make a statement, he answered "no," and indicated that he wanted an attorney. Thereupon he was immediately taken to the Douglas County courthouse before the Honorable John C. Burke, who again explained his rights to him and allowed him to call an attorney. From Judge Burke's court, appellant was taken to the police station. On the way to the police station the officer in question told defendant that he would like to have the gun. At that time defendant stated that the gun was broken down into three pieces. The officer asked what type of gun it was. Defendant replied that it was an army survival type gun that breaks down into three pieces. The officer asked where the gun could be located, and defendant related that it was in the Carter Lake area. The officer was then asked if he pursued the conversation as to where the gun was, and his answer was as follows: "We tried to. Then he refused to answer any more questions." At this point, defendant's counsel made an objection and asked that the answer be stricken. The last part of the answer was stricken and the jury was admonished to disregard it. Defendant's counsel then moved for a mistrial, which was overruled.

Complaint is made about the testimony relative to the silence, but not particularly as to the admission of defendant's statements regarding the murder weapon. As a matter of fact, the defendant himself testified as to the weapon and that he had thrown it in the lake.

We fail to see, on the present record, how the defendant could possibly have been prejudiced by this testimony. The foundational testimony was necessary for the admission of the defendant's statement about the gun used in the murder.

In State v. Country, 184 Neb. 493, 168 N. W. 2d 918, we held: "The asking of improper questions of a witness to which objections are sustained by the court do not constitute prejudicial error in the absence of a showing that defendant was thereby deprived of a fair and impartial trial." There was absolutely no question about defendant's participation in the events which culminated in the murder, or in the fact that it was his finger which pulled the trigger.

The United States Supreme Court, in Lutwak v. United States, 344 U. S. 604, 73 S. Ct. 481, 97 L. Ed. 593, said in regard to an item of evidence that came in the record: "In view of the fact that this record fairly shrieks the guilt of the parties, we cannot conceive how this one admission could have possibly influenced this jury to reach an improper verdict. A defendant is entitled to a fair trial but not a perfect one."

We find there was no error prejudicial to the defendant in this instance. However, if there was, it certainly would be within the ambit of the above rule.

The original brief's third and fourth assignments of error concern the admission over objection of the testimony of Judy Dunbar to a beating inflicted upon her by the defendant with a gun, and to the court's instruction to the jury that it could consider the evidence of the beating to show intent, purpose, and motive. Judy Dunbar, the girl defendant was seeking the night of the murder, was permitted to testify to a severe beating she received at the hands of the defendant on the occasion of their last meeting in August 1968. As a general rule, evidence of other crimes than that with which the accused is charged is not admissible in a criminal prosecution. Fricke v. State, 112 Neb. 767, 201 N. W. 667.

However, in crimes involving motive, criminal intent, or guilty knowledge, evidence of independent crimes wholly disconnected with the one charged may be received. Swogger v. State, 116 Neb. 563, 218 N. W. 416. See, also, Grandsinger v. State, 161 Neb. 419, 73 N. W. 2d 632; Erving v. State, 174 Neb. 90, 116 N. W. 2d 7.

On the occasion in question, defendant beat Judy Dunbar with his fists, kicked her, and also used a gun. On the night of the murder, the defendant went to the home of Judy's parents and on three different occasions to the Lynch home, looking for her. Each time he was carrying the gun. When defendant told Lynch to stay away from Judy Dunbar he had the gun in his hands, with the clip inserted, and subsequently he shot at a brush pile, which emphasized the fact that the gun was loaded. Defendant testified the gun was always loaded. The court, by instruction No. 19, specifically limited this testimony, as follows: "The State has introduced testimony of an alleged attack made upon one Judy Dunbar by the defendant in August 1968 with the use of a weapon.

"Evidence of a separate and different crime, previously committed by the defendant, in a manner similar to that charged herein, is admissible in a prosecution that has an element of a motive, purpose or criminal intent.

"This evidence of another crime previously committed, which tends to show the inclination or disposition of the defendant to commit such crimes and fix the pattern of previous conduct on his part, are relevant and admissible when it tends to prove motive, purpose, or a particular criminal intent which is necessary to constitute the crime charged. Such evidence was received solely for the limited purpose of showing intent, purpose, or motive of the accused in the particular acts charged. You must not, therefore, consider such evidence for any other purpose."

The original brief's fifth assignment of error concerns the trial court's permitting the prosecution to ask the

defendant if he had ever been convicted of a felony. Section 25-1214, R. R. S. 1943, provides: "A witness may be interrogated as to his previous conviction for a felony, but no other proof of such conviction is competent except the record thereof." This same question was raised in State v. Jones, 183 Neb. 133, 158 N. W. 2d 278. In that case we held: "A defendant in a criminal case who becomes a witness subjects himself to the rules applicable to other witnesses." See, also, State v. Clingerman, 180 Neb. 344, 142 N. W. 2d 765.

The last assignment of error in the original brief concerns the overruling of defendant's motion for a mistrial during the examination of Jens Christensen, the brother-in-law of Judy Dunbar. His testimony is as follows: "Q. How long have you known Ronald Kirby? A. I have met him a couple times. When he is—before he went to prison—MR. HORNSTEIN: Move for mistrial. THE COURT: Ladies and gentlemen, you will disregard any statement that has been made; completely disregard the statement. It shall be considered by you in no, any fashion whatsoever. Motion overruled. You may continue."

What we said relative to the testimony on the second assignment of error is pertinent on this point. The answer was unexpected, and the court immediately instructed the jury to disregard it. It is a rule in this jurisdiction that if an objection or motion to strike is made and the jury is admonished to disregard it, the alleged tainted evidence is not error. State v. Country, 184 Neb. 493, 168 N. W. 2d 918. Unless we are willing to rule that a defendant is entitled to a perfect or a flawless trial, this assignment of error cannot be sustained. Here the trial court, without a motion to strike or to admonish the jury, immediately directed the jury to completely disregard the statement. In its instructions to the jury the trial court specifically admonished the jury that it was not to consider any evidence stricken by the court. As stated in Lutwak v. United States,

344 U. S. 604, 73 S. Ct. 481, 97 L. Ed. 593, the defendant is entitled to a fair trial but not a perfect one.

We find no prejudicial error in this record. The judgment herein is affirmed.

AFFIRMED.