STATE OF NEBRASKA, APPELLEE, V.
PAUL J. ROWE, APPELLANT.

315 N.W.2d 250

Filed January 22, 1982.   No. 44041.

Kirk E. Naylor, Jr., for appellant.

Paul L. Douglas, Attorney General, Dale D. Brodkey, and Linda Willard for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, and HASTINGS, JJ., and RONIN, Retired District Judge.

PER CURIAM.

The defendant, Paul J. Rowe, was charged in the District Court for Cass County with having on May 1, 1980, committed murder in the first degree and arson in the first degree. The court submitted to the jury the issues of the defendant's guilt on a charge of murder in the second degree and arson in the second degree. The jury returned verdicts of guilty on these charges, and the court sentenced the defendant to a term of life imprisonment on the homicide charge and to a concurrent term of 3 to 5 years on the arson charge.

In this court the defendant makes and argues the following assignments of error: (1) The trial court erred in refusing the defendant's requested instruction which would have submitted to the jury the lesser-included offense of manslaughter. (2) The court erred in refusing to sustain the defendant's challenge for cause of one

member of the jury panel. (3) The court erred in over-ruling the defendant's objection to the admission in evidence of certain photographs of the victim of the homicide. (4) The court erred in refusing to instruct the jury on "brain death" in accordance with the defendant's tendered instruction. (5) The court erred in failing to sustain the defendant's objection to questions asked by the prosecutor relating to the difference in the defendant's appearance on May 1 and at trial. (6) The court erred in refusing to receive in evidence tape recordings of an interview of the defendant by a defense psychiatrist, which interview took place while the defendant was under the influence of sodium amytal administered by the psychiatrist for the purpose of the interview. The tapes were part of the psychiatrist's basis for evaluating the defendant's mental state during part of the times relevant to the crimes charged.

We reverse the homicide conviction because of the court's failure to instruct the jury on the lesser-included offense of manslaughter and remand for a new trial on the homicide charge. We affirm the arson conviction and sentence.

A resume of some of the evidence and general background facts is necessary to a discussion of some of the assigned errors. Other evidentiary facts will be related as necessary in connection with our discussion of the particular assignments.

The defendant and his wife, Layne Rowe, resided in a farm residence near Alvo, Nebraska. The defendant was an independent trucker. The wife was employed by a Lincoln manufacturer. On the morning of May 1, 1980, passers-by noticed smoke coming from the Rowe residence and noted the house was burning. The fire department was called. After the fire had been extinguished, the body of Layne Rowe was discovered, wrapped in a blanket and lying on a bed in one of the second floor bedrooms. The defendant was not found at the residence, but later that day family members informed the "authorities" that the defendant was in a

Lincoln hospital where he had earlier that day been admitted upon the request of a Lincoln psychiatrist, Dr. E. F. Whitla.

Mrs. Rowe's body, when discovered, was found to be mutilated in the following fashion: One breast had been removed with a sharp instrument. An incision with a sharp instrument had also been made in the torso from just below the sternum through the vaginal and rectal areas, exposing the viscera and other internal organs. A later autopsy disclosed that in addition to the mutilations above described, Mrs. Rowe had suffered a skull fracture in the area back of the left ear. The sternum was also fractured.

The pathologist who performed the autopsy testified that a skull fracture of such a nature would have ultimately resulted in death. However, the immediate cause of death was bleeding, a consequence of the mutilations in which the iliac artery to the right leg had been severed. In the pathologist's opinion, the skull fracture occurred before the mutilations. The basis for the opinion was that in order for the mutilations to have occurred, the victim would have had to have been unconscious because there were no signs of resistance as indicated by an absence of any defensive wounds or bruises on the arms. He further expressed the opinion that the victim was still alive when the incision was made and the artery severed. This conclusion was evidenced by the absence of blood in the heart and blood vessels, indicating that the heart was still beating when the cutting occurred.

The pathologist further testified that he believed the skull injury resulted from a moving object striking the skull. He explained the forensic medical reasons for this conclusion. The nature of the fracture was consistent with one which would result from a blow with the side of the head of a clawhammer found on a landing at the head of the stairs near the entrance to the bedrooms. He stated that the fracture could not have been caused by the head striking a flat object such as a floor. On

cross-examination he indicated that it was possible, but unlikely, that the fracture could have resulted from the head striking the edge of the steps.

The defendant, through counsel and in open court, judicially admitted he made the cuts upon his wife's body.

The defense to the homicide charge had two aspects. First, the defendant denied he had struck his wife, and argued that the skull fracture must have occurred when she fell down a stairway. Secondly, he argued that when the cutting of his wife's body occurred, he was suffering from a "brief reactive psychosis," a consequence of the belief his wife was dead. It was also argued that he was in the psychotic state when he admittedly set the house afire.

The defendant took the stand in his own behalf. He testified that he did not strike his wife with any object. According to his version of events, he came home about 11 p.m. on the day before the fire. He had been at a bar, drinking beer and dancing. When he came home Layne was in bed. He had another beer and then went to bed in the room in which he and Layne habitually slept. Layne was sleeping in the guest bedroom. He assumed this was because she had to rise about 4:30 a.m. to be at work at 6 a.m. He fell asleep without disturbing her. Later he heard a noise and got up to investigate. He found Layne at the bottom of the steps, unconscious and bleeding from the nose. He attempted to revive her, using cardio-pulmonary resuscitation, but his efforts failed. He felt she had left him. He wanted to join her and attempted to shoot himself, but the weapon did not fire. The earlier described mutilation then took place. His testimony surrounding the mutilation was similar to that he related to the defense psychiatrists, on the basis of which they rendered their opinion of "brief reactive psychosis," initiated by his wife's assumed death. The psychiatrists stated he did not know right from wrong nor appreciate the nature and quality of his act during the time of the mutilation. Their testimony was based upon the defend-

ant's statements made to them during their examination of him. The testimony of the psychiatrist testifying for the prosecution contradicted that of the defense and was to the effect the defendant was legally sane at the time of the occurrence in question.

At the close of all the evidence, the defendant moved the court not submit to the jury the charge of murder in the first degree. The court granted that motion because there was no evidence from which the jury could conclude the homicide, if such it was, was premeditated. The court charged the jury on the elements of murder in the second degree and denied the defense request (as well as that of the prosecution) that the instructions include submission of the crime of manslaughter.

Neb. Rev. Stat. § 29-2027 (Reissue 1979) provides in part: "In all trials for murder the jury before whom such trial is had, if they find the prisoner guilty thereof, shall ascertain in their verdict whether it be murder in the first or second degree, or manslaughter . . . ." Neb. Rev. Stat. § 28-304 (Reissue 1979) provides in part: "(1) A person commits murder in the second degree if he causes the death of a person intentionally, but without premeditation." Neb. Rev. Stat. § 28-305 (Reissue 1979) provides in part: "(1) A person commits manslaughter if he kills another without malice, either upon a sudden quarrel, or causes the death of another unintentionally while in the commission of an unlawful act."

The rule in this and most jurisdictions is that where murder is charged, the court is required, without request, to charge on such lesser degrees of homicide as to which the evidence is properly applicable. Under this rule, to require an instruction on manslaughter the record must contain some evidence which would tend to show that the crime was manslaughter rather than murder. *State v. Beers*, 201 Neb. 714, 271 N.W.2d 842 (1978). Malice denotes that condition of mind which is manifested by the intentional doing of a wrongful act without just cause or excuse. *State v. Beers, supra.*

The question which must be decided is whether there

is at least some evidence which would permit the jury to find the defendant guilty of a killing without malice, either upon a sudden quarrel or unintentionally while in the commission of an unlawful act.

It is clear that evidence which indicates an accused strikes another in the head with a hammer with sufficient force to inflict a very deep skull fracture, sufficient of itself to ultimately cause death, and then inflicts with a sharp instrument wounds so severe that any rational person would know that death will result therefrom is sufficient to show an intention to kill. The same conclusion, of course, could be reached from the facts indicating that death resulted from the use of the hammer alone.

The difference between murder in the second degree and manslaughter, as defined in the first clause of § 28-305, is the absence of malice. Absence of malice may exist where the killing occurs upon a sudden quarrel. See *State v. Beers, supra.* Here there was circumstantial evidence from which the jury could conclude that this killing was a consequence of a sudden quarrel. The defendant came home after a night of drinking and dancing. He found his wife not in the bed which they customarily shared, but in another room. His sexual desires were urgent. (He acknowledged he was naked when all the events at the residence transpired.) Fulfillment of his desires was rejected. This resulted in a quarrel, the result of which was his striking his wife with a hammer. His rage was still so great that he mutilated her sexual organs. The pathologist testified: "When the incision got into the area of the pubic hair, from this area down into the rectum and the vagina, there were multiple cuts going in various directions, some of which extended up into the vagina."

Assuming the jury accepted the defendant's contention that his wife was rendered unconscious by a fall, it is clear they must have rejected his claim that during what followed he did not know right from wrong nor appreciate the nature and quality of his act. Having re-

jected that claim, they could find that he unjustifiably thought his wife was dead and then caused her death while in the course of an unlawful act, to wit, assault. Neb. Rev. Stat. § 28-309(1)(a)(b) (Reissue 1979); *State v. Worley*, 178 Neb. 232, 132 N.W.2d 764 (1965).

It is neither for the trial court nor for this court on appeal to draw conclusions of fact when two reasonable inferences may be drawn from the evidence. The trial court erred in not submitting to the jury the lesser-included offense of manslaughter along with the charge of murder in the second degree.

During the voir dire examination of the jury panel, one of the members of the panel, in responding to questions by defense counsel, expressed awareness that an accused found not guilty by reason of insanity might soon be released. The same panel member then responded to questions propounded by defense counsel as follows: "Q — Now you recognize, do you not, that if you were to find in this case that Paul Rowe was insane at the time that he did some things, caused injuries to the body of his wife and set fire to his home on May 1st of this year, if you found that he was insane at the time, or even if you had a reasonable doubt as to his sanity, the burden of proof being on the prosecution, would it be your obligation to find him not guilty?

"A — So then what is the question?

"Q — Well, then he wouldn't be punished in that case. Could you live with that idea?

"A — No.

"Q — It would be difficult for you to do that?

"A — Uh-huh.

"Q — Well, then that would bring the question up in this case: Really, can you follow the law? It may be a crime not to follow the law in certain situations. You know what I mean? Like speeding or stopping at the stop sign. But you realize that if you were to tell the judge in this case: My feeling is, look, I know that the law provides for a defense of insanity and I know that the law provides that if a person is insane at the time they do a

particular thing, a thing that I see as being terrible, that I am to find them not guilty. They're not to be punished. But still I feel so strongly about the matter that I just couldn't follow the law in that regard. Do you have that feeling?

"A — I believe I probably would have.

"Q — So do you think then that no matter what the judge said about the law in the case, that you would not be able to accept the defense of insanity if it meant that the person would not be punished?

"A — Yes, that's true.

"MR. NAYLOR: Your Honor, I would ask that Mrs. Murdoch be excused for cause."

The trial judge then questioned this panel member as follows: "THE COURT: Mrs. Murdoch, you have answered that question on at least a half dozen occasions in a different phraseology where you could follow the law. You told the Court this. You could put aside your personal feelings and you could make a determination exactly from what evidence was presented here in court.

"MRS. MURDOCH: Uh-huh.

"THE COURT: Now do you understand the question? Are you changing your answers?

"MRS. MURDOCH: I hope not. I hope I'm not changing my mind. I feel that I could listen in and make a decision according to the law.

"THE COURT: That's exactly what the law demands of you. And that's — No, I'll deny that challenge."

Thereafter, the defendant used one of his peremptory challenges to strike the juror from the panel.

It is the rule that a juror who cannot subordinate his personal views on an issue of law and obey the law in deciding the case must be excused for cause. *State v. Kirby*, 185 Neb. 240, 175 N.W.2d 87 (1970). However, it appears from the questioning by the court that the feeling of the juror was not so fixed that she would be unable to abide by the court's instruction as to the law. The court did not err in overruling the challenge.

The defendant argues it was error for the court to receive in evidence over his objection four photographs, exhibits 30, 31, 32, and 33. The photographs were, respectively: (1) One picture of Layne Rowe's body in the condition it was delivered to the hospital for the autopsy, partially covered with a burned quilt. (2) One picture of the torso showing the mutilations. (3) Two photographs of the victim's skull taken during the autopsy. The objections to these exhibits are: (1) They are irrelevant because the defendant had stipulated he did the cutting. (2) The risk of unfair prejudice outweighs the marginal relevance the photographs might have. (3) Sufficient foundation was not established because it is not clear from the evidence when the skull photos were taken.

In objecting to these exhibits, the defendant relies upon the principles stated in Neb. Rev. Stat. § 27-403 (Reissue 1979) as follows: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

The objection on the grounds of relevance is founded upon the defendant's stipulation that the defendant did the cutting and the pathologist described adequately his observations, what he did during the autopsy, and his conclusions. The objection on the basis of unfair prejudice is founded upon the proposition that the photographs are "grisly" and "gruesome." It must be conceded they are. The third objection is based upon the claim that the jury might have believed the photos of the skull showed injuries made by the defendant rather than wounds from the autopsy.

In *State v. Williams*, 205 Neb. 56, 67, 287 N.W.2d 18, 25 (1979), we said: "The admission of photographs of a gruesome nature rests largely within the sound discretion of the trial court, which must determine their relevancy and weigh their probative value against their

possible prejudicial effect. State v. Freeman, 201 Neb. 382, 267 N.W.2d 544. Although it is true that the probative value of gruesome photographs should be weighed against the possible prejudicial effect before they are admitted, if a photograph illustrates or makes clear some controverted issue in a homicide case, a proper foundation having been laid, it may be received, even if it is gruesome. State v. Partee, 199 Neb. 305, 258 N.W.2d 634. In a homicide case, photographs of the victim, upon proper foundation, may be received in evidence for purposes of identification, to show the condition of the body, the nature and extent of wounds or injuries, and to establish malice or intent. State v. Dittrich, 191 Neb. 475, 215 N.W.2d 637."

The defendant's judicial admission covered only the fact that he mutilated his wife's body. He did not admit he caused the skull fracture. It is clear from the testimony that exhibits 32 and 33 were made during the autopsy; one photo being taken after the scalp had been laid back and the other after the skull had been opened. The testimony showed that the head wound which occurred when the skull was fractured was not evident from casual external examination, and there was no external bleeding from the wound. These two photographs show quite clearly the depth and, to some extent, the configuration of the fracture in a way that words cannot express. These photographs would assist the jury in determining the validity of the pathologist's testimony that the fracture occurred in the way he stated it did. One photograph in particular illustrates the severity of the impact which caused the fracture. These photographs would tend to lead a layman to the conclusion that such a fracture could not be caused by a fall on wooden steps. The court would have erred if it had refused the admission of these photographs, even though the State would have no recourse had they not been received.

The picture of the torso and the blanket-wrapped body fall into the category which we believe lies within

a proper judicial discretion. The picture of the torso shows the nature of the major incision and would tend to cast doubt on the defendant's statement to the psychiatrists that a purpose of the cutting was to remove a baby, which defendant believed Layne might be carrying. This photo also tended to show either the defendant's insanity or, on the other hand, the extent of his rage. The photo of the blanket-covered body was marginally relevant, but would tend to support the contention that the purpose of the fire was to conceal the crime by burning, thus casting some doubt upon the defendant's claim that the fire was set to purge the house of the evil spirit he believed was present. The admission of these last two photographs on retrial will be at the discretion of the district judge.

The defendant requested that the jury be given the following instruction: "The term 'death,' as used throughout Instruction No. _____ means a physical state when a human body is:

"1. Unresponsive to normally painful stimuli, is;

"2. without spontaneous movements or breathing; and

"3. is without reflexes.

"If all of the foregoing conditions exist, death has occurred." The defendant's argument supporting his request of this instruction is somewhat complex, but its essence is that counsel wished to argue to the jury that when the mutilations occurred Layne Rowe had already suffered "brain death" and as a consequence the mutilations were not the cause of her death.

The court did not err in refusing this instruction, for there is no evidence which would make that definition applicable. The only competent evidence before the court was that Layne Rowe was alive when the mutilations occurred, i.e., her heart was still beating and she was still breathing. The pathologist testified that the conventional definition of death involves permanent cessation of heart action and breathing. Furthermore, the requested instruction, standing alone, would have been confusing to the jury, for it was not applicable

except by separating the responsibility for the consequences of the skull fracture and the mutilation. The jury could not have determined how to apply that definition if the verdict was based upon a finding of defendant's responsibility for both the skull fracture and the mutilations. The question for jury simply was, did Layne Rowe die because of a culpable act of the defendant, either the blow to the head and the mutilation, or the mutilation alone? An issue on death such as the defendant raised by the requested instruction might arise when the victim's life was sustained by life-support systems and dies when those systems are removed by other than the accused, or perhaps where the removal of the life-support systems is the claimed wrongful act.

On cross-examination of a defense witness the following occurred. "Q — Mr. Rowe, is Paul's physical appearance today the same as it was the day of May 1st when you saw him?

"A — No.

"Q — I don't mean the way he acted, just the appearance. What's different?

"MR. NAYLOR: Your Honor, I would object to that as being irrelevant.

"THE COURT: Overruled.

"A — He had a mustache.

"Q — How about his hair?

"MR. NAYLOR: Your Honor, I would object. That is irrelevant.

"THE COURT: Overruled.

"A — It might have been a little longer, not very much."

The questions about the difference in the defendant's appearance were irrelevant to any issue before the court. The objection should have been sustained. However, the answers were innocuous, and we do not believe the prosecutor's implication could bear any weight whatsoever with the jury in its determinations. The prosecutor is directed not to repeat such nonsense on the retrial.

We now reach the final question of whether the court erred in refusing to receive in evidence the tapes of the interview by one of the psychiatrists. At this point it should be made clear that the psychiatrist was not in any way restricted in testifying as to the bases of his diagnosis, including everything the defendant told him. Dr. Baldwin interviewed the defendant a second time on June 13, 1980. Before the second interview, the doctor injected the defendant with the drug sodium amytal. The purpose of injecting the drug, the doctor testified, was to enable the defendant to talk more freely about painful emotions. The defendant offered the tapes in conjunction with the doctor's testimony to point out what he determined to be the indications of psychosis. The court rejected the offer of the tapes. The nature of the evidentiary offer may be summarized from the following statements in the defendant's brief at 61-63: "Dr. Baldwin testified that the use of the drug assisted him *by reducing the defendant's inhibitions*, in determining his mental state at the time of the alleged crimes (683:3), and he offered to point out what he determined to be the indications of psychosis thru [sic] the use of a tape recording made of the interview (683:11). He was prohibited by the trial court from so doing (684:3).

"Prior to the testimony of Dr. Baldwin, defense counsel alerted the trial court to the fact that he intended to offer in evidence, during Dr. Baldwin's testimony, two tape recordings made by Dr. Baldwin during the June 13th interview while defendant was under the influence of sodium amytal. Further, that Dr. Baldwin would testify, as he ultimately did, that the tapes would assist him in a *practical description of the defendant's mental state at the time of the crimes charges* (551:23)
. . . .

. . . .
"The defendant then made a detailed offer of proof, which established that if Dr. Baldwin were allowed to testify about the recordings he would testify that they

presented a true and accurate record of the conversation he had with the defendant while defendant was under the influence of sodium amytal on June 13, 1980, that sodium amytal was a generally accepted diagnostic and evaluation tool used within his profession, *and that he used the drug successfully in this case to develop evidence of the defendant's thinking processes and state of mind at the time of the crimes charged* (675:13)." (Emphasis supplied.)

At this point it must be noted the defense is that the defendant suffered from a "brief psychotic episode." The testimony of the two defense psychiatrists differed principally only as to the time when the psychotic episode began. Both testified he was in a psychotic state at the time he made the cuts and set the fire. No claim of psychosis is made in relation to the time the State contends he struck his wife with a blunt instrument. Dr. Baldwin implied that disoriented thinking, but not the psychotic state, began when he saw his wife at the bottom of the stairs. Dr. Whitla testified the defendant was not psychotic when he first carried his wife upstairs and laid her on the bed (according to Rowe he did this twice, once before and once after the mutilation — the mutilation having taken place in the bathtub downstairs). Dr. Whitla stated defendant was not psychotic when he saw him on the afternoon of May 1 after the events.

The taped interviews contained defendant's statements of his thoughts when he awoke after hearing a thud. Also included are responses to leading questions not related to the defendant's state of mind, but to observations that he had made, i.e., whether the blood spurted when he did the cutting. The doctor's own statement indicates the purpose of that particular question was to determine whether Layne Rowe was dead at the time. Such out-of-court statements are clearly not relevant to the issue of the defendant's mental state at the time of the alleged crimes. While considerable latitude is permitted in the admission of evidence tending to

show the mental condition of the accused when insanity is the defense, it must relate to the mental state of the accused at the time of the acts charged. *Lyons v. State*, 156 Neb. 550, 57 N.W.2d 82 (1953); *State v. Moore*, 303 S.W.2d 60 (Mo. 1957); 22A C.J.S. *Criminal Law* §§ 620(1) and 737 (1961). The acts and observations mentioned, as well as others on the tapes, were hearsay statements and inadmissible under the provisions of Neb. Rev. Stat. § 27-801(3) and (4)(a) (Reissue 1979). Neither do they come within the exception of Neb. Rev. Stat. § 27-803(3) (Reissue 1979). The court did not err in rejecting the taped interviews. The jury would most likely consider defendant's statements as substantive evidence.

Although the defendant's offer was couched in terms of not being offered to prove the truth of the defendant's statements, it seems clear enough that the doctor's statement about "reducing inhibitions" tends to imply reliability of the defendant's statement while under the influence of the drug. This position has been rejected by most courts which have considered the use of such drugs. *People v. Fournier*, 86 Mich. App. 768, 273 N.W.2d 555 (1978); *People v. Cox*, 85 Mich. App. 314, 271 N.W.2d 216 (1978); *People v. Johnson*, 32 Cal. App. 3d 988, 109 Cal. Rptr. 118 (1973) (in the latter case the statements were offered for purposes of incriminating the defendant); *People v. Hiser*, 267 Cal. App. 2d 47, 72 Cal. Rptr. 906 (1968); *State v. Chase*, 206 Kan. 352, 480 P.2d 62 (1971); *Marshall v. State*, 620 P.2d 443 (Okla. Crim. 1980).

The arson conviction and the related sentence are affirmed. The conviction on the homicide charge is reversed and remanded for a new trial.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED FOR A NEW TRIAL.

WHITE, J., participating on briefs.

CLINTON, J., dissenting in part and concurring in the result.

I respectfully dissent from the portion of the opinion which holds that the peremptory challenge of the juror Mrs. Murdoch was not error. It is the rule that a juror who cannot subordinate his personal views on an issue of law and obey the law in deciding the case must be excused for cause. *State v. Kirby*, 185 Neb. 240, 175 N.W.2d 87 (1970). The answer of the juror to counsel's question was rather clear-cut. The court should not have attempted to rehabilitate the juror. See *Irvin v. Dowd*, 366 U.S. 717, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961). The court erred in not sustaining the challenge.

However, since the juror did not serve, the question becomes whether or not the defendant was prejudiced by the necessity of using one of his peremptory challenges to remove the juror. In some jurisdictions the need to use a peremptory challenge to disqualify a juror who should have been removed for cause is presumed to constitute prejudical error. However, that is not the law in this jurisdiction. If a trial court erroneously fails to sustain the proper challenge of a juror for cause, a reversal will not result unless the record shows that the error brought injury to the accused. *Bufford v. State*, 148 Neb. 38, 26 N.W.2d 383 (1947). This case overruled earlier Nebraska cases holding otherwise. The record in this case does not show the defendant was prejudiced by having to use the peremptory challenge.

I concur in the remainder of the opinion and, therefore, concur in the result.