STATE OF NEBRASKA, APPELLEE, V. JOHN B. GREGORY, APPELLANT.
371 N.W.2d 754

Filed August 16, 1985.   No. 85-035.

J. William Gallup, for appellant.

Robert M. Spire, Attorney General, and L. Jay Bartel, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

CAPORALE, J.

Following a trial by jury, defendant-appellant, John B. Gregory, was convicted of first degree assault and of using a firearm to commit a felony. He was thereafter sentenced to imprisonment at the Nebraska Penal and Correctional Complex for a period of 1 year on each conviction, the sentence on the firearm conviction to be served consecutively to the sentence on the assault conviction. In this appeal of each of his convictions and sentences, he assigns as errors (1) the failure to grant a mistrial because of prosecutorial misconduct; (2) the receipt of opinion testimony concerning the truthfulness of two of the State's witnesses; (3) the receipt of rebuttal testimony concerning the same two witnesses' prior consistent statements; and (4) the claimed excessiveness of the sentence. We affirm.

On Sunday, June 10, 1984, Charles Fisicaro, an Omaha police officer, responded to a radio call which reported a shooting. Upon his arrival, at approximately 8:30 a.m., he found a man, later identified as Philip Drickey, lying face down on the sidewalk in front of Gregory's home. As Officer Fisicaro approached Drickey, the latter looked up and said, "Can you believe it? He shot me over two papers." A rescue squad subsequently arrived and took Drickey to the hospital, where he, after emergency surgery, ultimately recovered from the damage to his bowel and ureter.

Earlier that morning, Drickey accompanied his son, Scott, and Scott's friend, Charlie Murrin, to help them deliver newspapers. Although on that morning Scott was working as a substitute carrier for a friend, he had previously worked on a paper route of his own, with which Drickey had helped.

At approximately 7 a.m. on the day in question, Drickey and the two boys picked up an initial supply of newspapers at the Gregory house, where Mrs. Gregory served as a distributor. After delivering their initial supply the carriers discovered that they were five papers short. As had been done in the past, Drickey and the boys returned to the Gregory house to get the needed additional papers. Drickey parked his truck in front of

the Gregory driveway, and the two boys walked up to the front door, while Drickey remained in his truck.

The boys informed Gregory that they needed five newspapers. Scott and Charlie waited outside the house while Gregory called his wife to find out what he should do. Unable to reach his wife, Gregory gave the boys three newspapers, telling them that the other two papers were needed for other paperboys. Scott and Charlie returned to the truck and told Drickey that they had received only three newspapers and that Gregory had two more papers.

Drickey left the truck and went to Gregory's door. Drickey testified that he had experienced similar problems when his son had his own route and that he had always gone to the Gregorys to try to obtain the needed additional papers.

Gregory's version and Drickey's version of what happened after that differ. Because of the nature of Gregory's assignments of error, it becomes necessary to separately review the evidence of some of the trial witnesses.

Drickey, a 6-foot-tall 36-year-old ironworker weighing approximately 175 pounds, testified that he opened the screen door and knocked on the main door to the home. Gregory answered the door, and Drickey told Gregory that they were short five papers and that "the boys were just trying to do a job." According to Drickey, Gregory mumbled something and slammed the door. Drickey then turned and walked toward his truck, but upon reaching the driveway, turned around and went back to the house to learn where extra papers could be obtained. Drickey opened the screen door and stood between it and the main door with the screen door at his back, and again knocked while he stood on the front step. The main door opened, and Drickey saw a flash and realized he had been shot. He then lunged forward from the step into the front hallway of the house, where he lay to remain calm, because he was in fear of his life. At this point Drickey begged Gregory not to shoot again, to which Gregory replied, "Aren't you dead yet?" Drickey became afraid he was going to be shot again, so he dragged himself outside the door and onto the front sidewalk.

Gregory, a 5-foot 10-inch diabetic civil engineer 66 years of age, testified that after he had given the boys three newspapers,

Drickey came up the driveway. Gregory then stepped outside and said, "Good morning." Drickey, in a loud and angry voice, said, "I don't take this bullshit from anybody. If you've got five newspapers, you give me five newspapers. I don't take this shit." Gregory became afraid, as he "could see" that Drickey was ready to fight, so went inside his house and closed the door. He saw Drickey start to leave, then turn around and come back to the house. Drickey opened the screen door and, instead of ringing the doorbell, kicked, banged, yelled, and cursed. Being afraid Drickey had brought a gun from the truck, Gregory went to his dresser to get a weapon so as to defend himself. Drickey then charged through the door into the house, swinging his fist; Gregory fired once to stop him after Drickey was inside the house. Gregory denied having asked Drickey, "Aren't you dead yet?"

Both boys were called by the prosecution and testified that at the time of the shooting they observed Drickey from the front seat of the truck parked in front of the driveway. According to them, Drickey was standing outside the door of Gregory's home when shot and stumbled into the house after he was shot. The boys also testified that Drickey was not threatening Gregory when he was shot.

A witness called by the defense as an expert in weaponry testified that the impact from the weapon and ammunition used by Gregory would have caused Drickey to fall backward rather than forward.

There are three bases to Gregory's contention that the trial court should have granted a mistrial: that the prosecutor (1) asked Gregory if he had ever had "any involvement with the police"; (2) commented upon Gregory's silence during police interrogation; and (3) said to the jury during closing argument that the State would not have prosecuted had the circumstances been as defendant said they were.

The first incident occurred during the prosecution's cross-examination of Gregory, wherein the prosecutor, Robert C. Sigler, asked: "Well, let me try this one: Yesterday Mr. Gallup [J. William Gallup, defense counsel] asked Mr. Drickey if he had ever had any involvement with the police. Have you ever had any involvement with the police?"

The defense argues in its brief that "[a] freshman in law school knows that impeachment on the basis of prior convictions is limited to felonies or misdemeanors involving dishonesty. The Evidence Code spells this out in language that a kindergarten student can understand." Brief for Appellant at 16-17.

Such may be, but a review of the questioning of Drickey by defense counsel on the previous day enables us to understand why the prosecutor phrased the question as he did. Defense counsel questioned Drickey as follows:

Q. You haven't had any run-ins with the police, have you?

A. Any run-ins so far as what?

Q. Any involvement with the police.

MR. SIGLER: Objection, Your Honor. He knows that's not proper.

MR. GALLUP: Will you just tell him to make his objection?

THE COURT: Overruled. You may answer.

THE WITNESS: What's the question again?

MR. GALLUP: Would you read it back?

Q. (Preceding question read by the reporter as follows: "Any involvement with the police."

A. Have I ever had any involvement with the police? Yes, sir.

Q. When was that?

A. It was — I don't know what the charge was. It was a disorderly conduct.

Q. Against you?

A. Yes.

Q. For fighting?

A. No, sir.

Q. What specifically did they accuse you of doing?

MR. SIGLER: Judge, that is irrelevant.

THE COURT: I'll sustain the objection.

BY MR. GALLUP:

Q. You don't consider that you did anything disorderly on this occasion?

A. What's that?

> Q. · The occasion the day you got shot, you hadn't been disorderly?
>
> A.   No, sir.
>
> MR. GALLUP: That's all.

Nonetheless, the prosecutor should have restrained himself and should not have asked the objectionable question. The trial judge recognized this fact and sustained the defense's objection before any answer was given. Gregory argues, however, that this was not enough, that the trial court should have granted a mistrial as well. He is mistaken.

In *State v. LeBron*, 217 Neb. 452, 349 N.W.2d 918 (1984), the defendant contended it was error for the trial court to overrule his motion for mistrial after testimony was elicited in violation of the court's prior sustainment of his motion in limine, notwithstanding the fact that the trial court sustained defendant's objection made after the improper question had been answered. We held that the trial court did not err in overruling the motion for mistrial, saying: "A conviction will not be set aside unless the defendant meets his burden of showing that the error claimed created actual prejudice rather than merely the possibility of prejudice." *Id.* at 459, 349 N.W.2d at 923.

In *LeBron* there is no showing that the answer prejudiced the defendant. In this case there is no showing that the question in and of itself was actually prejudicial to Gregory.

The trial court properly denied a mistrial at this point.

The next incident which Gregory claims entitled him to a mistrial also occurred during the prosecutor's cross-examination of him. As noted earlier, Gregory in effect testified on direct examination that he told police at the scene of the shooting that he was protecting his life and his property. The following exchange took place during the prosecution's cross-examination concerning this topic:

> Q.   Now, you say that you told the police you were protecting your life and your property, true?
>
> A.   That's true.
>
> Q.   You told them that, right?
>
> A.   Yeah, one patrolman. I know the one that was in here the last time for testimony this morning was

sitting at the table at the time the patrolman asked me the question.

Which patrolman I'm not sure about, but one asked me what happened.

Q. All right.

A. That's all I said.

Q. Yeah, you didn't tell any police that day about Mr. Drickey charging through the front door, did you? Did you?

A. No. In a subsequent question, I told him, "I want my attorney present," in a subsequent question.

Q. So this is the first time you are telling us any of this stuff about charging, kicking, screaming, cursing, and swearing?

Gregory's attorney objected to the last question and moved for a mistrial. The objection was sustained, but the motion for mistrial was overruled.

Gregory contends that somehow his fifth amendment privilege against self-incrimination was violated by the prosecution's question. He argues that by asking this question, the prosecutor was commenting on his claim of the privilege against self-incrimination, which is impermissible under Neb. Rev. Stat. § 27-513 (Reissue 1979):

(1) The claim of a privilege, whether in the present proceeding or upon a prior occasion, is not a proper subject of comment by judge or counsel. No inference may be drawn therefrom.

(2) In jury cases, proceedings shall be conducted, to the extent practicable, so as to facilitate the making of claims of privilege without the knowledge of the jury.

(3) Upon request, any party against whom the jury might draw an adverse inference from a claim of privilege is entitled to an instruction that no inference may be drawn therefrom.

The defense's argument is based on the premise that, under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and its progeny, once he claimed his fifth amendment privilege, he could no longer be questioned by

police without an observance of his *Miranda* rights and that his claim of that right may not be commented upon at trial. However, the defense misses an important point. The questions asked by the prosecutor related to what was said and not said before Gregory was in custody, and therefore prior to the time the *Miranda* warnings were required. See *State v. Duis*, 207 Neb. 851, 301 N.W.2d 587 (1981).

Thus, the trial court again correctly denied a mistrial at this second juncture.

Gregory's final motion for mistrial came following the prosecution's closing argument, wherein the prosecutor said that the State would never have prosecuted the defendant had the circumstances been as the defendant said they were.

In *State v. LeBron*, 217 Neb. 452, 349 N.W.2d 918 (1984), we held that the remarks of a prosecutor in a closing argument which do not mislead and unduly influence the jury and thereby prejudice the rights of the defendant do not constitute misconduct.

The defense's objection to the comment was sustained. Moreover, immediately after making the comment and after the court's sustainment of the objection, the prosecutor told the jurors that if they believed Drickey had charged into Gregory's house in an angry, loud, and threatening manner while swearing, as Gregory testified, then they should acquit Gregory. Those two events served to remove any prejudice to Gregory which might otherwise have resulted.

Once again, the trial court correctly denied a mistrial.

In his next assignment Gregory contends that the trial court erred in allowing Drickey's wife to express an opinion that her son, Scott, and his friend, Charlie, were truthful.

When Gregory was being cross-examined by the prosecution about his version of the facts, he stated that "[the boys] were well coached. They are incorrect."

Neb. Rev. Stat. § 27-608 (Reissue 1979) provides in part:

(1) The credibility of a witness may be attacked or supported by evidence in the form of reputation or opinion, but subject to these limitations: (a) The evidence may refer only to character for truthfulness or untruthfulness, and (b) evidence of truthful character is

admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

In *State v. Steinmark*, 201 Neb. 200, 266 N.W.2d 751 (1978), we held that where the credibility of the prosecution's witnesses was attacked through the testimony of other witnesses who contradicted parts of their testimony, the prosecution properly called rebuttal witnesses to testify as to the witnesses' truthfulness.

As in *Steinmark*, it is clear in this case that the boys' character for truthfulness was attacked by Gregory's statements that the boys were both "well coached" and "incorrect." By so saying, Gregory in effect claimed the boys were lying. As such, the trial court did not err by permitting the prosecution to call Mrs. Drickey as a rebuttal witness to testify as to her opinion that each of the boys had a truthful character.

In his third assignment of error Gregory contends that the trial court erred in receiving the rebuttal testimony of police Sgt. Walter Cooper. He complains that the sergeant's testimony constituted both hearsay and improper rebuttal testimony.

Sergeant Cooper testified that he interviewed Scott and Charlie on the day of the shooting, and at that time the boys said they had gone to Gregory's door to get the additional papers they needed and waited outside until Gregory brought them. They also told the officer that Drickey was shot while he was standing outside the house and that he fell into the house after he was shot.

Gregory had testified earlier that the two boys waited inside his house to receive the papers and that at the time he shot Drickey, Drickey was inside the house, charging at him.

Neb. Rev. Stat. § 27-801 (Reissue 1979) provides in part:

(4) A statement is not hearsay if:

(a) The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . (ii) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive . . . .

As noted earlier, Gregory expressly charged that the boys had

recently fabricated their trial testimony. Under the circumstances it is clear that the statements about which Sergeant Cooper testified were not hearsay. *State v. Johnson,* ante p. 392, 370 N.W.2d 136 (1985).

Neither is the defense's claim that the testimony was not proper rebuttal evidence correct. The testimony constituted relevant evidence to the charges against Gregory. Neb. Rev. Stat. § 27-401 (Reissue 1979). As such, it was proper rebuttal testimony, which has been defined to be competent testimony which tends to dispute the testimony offered on behalf of the accused as to a material fact. *State v. Miller,* 213 Neb. 274, 328 N.W.2d 769 (1983), *modified on other grounds, State v. West,* 217 Neb. 389, 350 N.W.2d 512 (1984); *State v. Esluer,* 215 Neb. 616, 340 N.W.2d 152 (1983).

Gregory's fourth and final assignment is that the sentences he received are excessive. Both offenses are Class III felonies. Neb. Rev. Stat. §§ 28-308 and 28-1205(2) (Reissue 1979). Each conviction therefore carries a possible sentence of from 1 to 20 years' imprisonment. Neb. Rev. Stat. § 28-105 (Reissue 1979). The sentence for conviction on the charge of using a firearm to commit a felony must run consecutively to the sentence on the conviction for first degree assault. § 28-1205.

Gregory argues that he should have been sentenced to probation in light of his age, background, and health. It is true that Gregory is a successful civil engineer, raised six children and provided them with a college education, and has no prior felony convictions, although on March 13, 1980, he was convicted of carrying a concealed weapon. Several of Gregory's associates and friends wrote letters to the sentencing judge and others concerning Gregory's generally good character. The record shows that the trial court considered these factors when deciding upon the appropriate sentence. It is obvious, however, that the trial court also properly considered the seriousness of the crime.

It is the firmly established rule of this jurisdiction that in the absence of an abuse of discretion, a sentence imposed within statutory limits will not be disturbed on appeal. It is also the firmly established rule that the denial of probation will not be overturned on appeal unless there has been an abuse of

discretion. *State v. Gillette*, 218 Neb. 672, 357 N.W.2d 472 (1984).

We cannot say there was an abuse of discretion.

There being no merit in any of Gregory's assignments of error, we affirm.

AFFIRMED.