STATE OF NEBRASKA, APPELLEE, V. ALLAN L. ANDERSON,
APPELLANT.

511 N.W.2d 174

Filed June 29, 1993.    No. A-92-475.

James Martin Davis for appellant.

Don Stenberg, Attorney General, and Mark D. Starr for appellee.

SIEVERS, Chief Judge, and HANNON and WRIGHT, Judges.

SIEVERS, Chief Judge.

A few minutes after midnight on October 27, 1991, Allan L. Anderson fired at least four shots from a Llama .45-caliber automatic pistol into the body of Virgil Cook, causing his death. Anderson was prosecuted for first degree murder under Neb. Rev. Stat. § 28-303(1) (Reissue 1989) and for the use of a firearm to commit a felony under Neb. Rev. Stat. § 28-1205(1) (Reissue 1989). A Douglas County jury convicted him of the lesser-included offense of manslaughter, see Neb. Rev. Stat.

§ 28-305 (Reissue 1989), and of using a firearm to commit a felony. He was sentenced on May 22, 1992, to a term of 4 to 6 years' imprisonment for the manslaughter conviction and to a consecutive 4- to 6-year term for the firearm conviction. Anderson has perfected his appeal to this court.

## I. ASSIGNMENTS OF ERROR

Anderson assigns three errors: (1) the trial court's refusal to admit Anderson's tape-recorded statement given to Omaha police within hours of the shooting; (2) the trial court's failure to give separate instructions for voluntary and involuntary manslaughter, including the separate elements of each; and (3) the trial court's imposition of excessive sentences.

## II. THE SHOOTING

On Saturday night, October 26, 1991, the victim, Cook, age 20, went to a pre-Halloween party with his girl friend, Brandi Martin. They were accompanied by Mitch Perrigo; his girl friend, Amy Woods; and a fifth person, Shalene Staton. According to the testimony of Woods, Perrigo, and Martin, after leaving the party the group returned to the area of 30th and Reynolds Streets in Omaha. Martin and Cook were to drop off the other three at an apartment maintained by Tab Borsh, which was located on the corner of 27th and Reynolds Streets, a block southeast of Anderson's residence.

The testimony of the youths was that Martin was driving her blue 1969 Chevelle with Cook in the front seat and the others in the back. At the intersection of 30th and Reynolds Streets, they were preparing to turn left when they encountered a pickup heading in the opposite direction which allowed them to proceed first. The Chevelle then proceeded east on Reynolds Street with the pickup following very close with its bright lights on. Instead of stopping at Borsh's apartment, the Chevelle turned right (south) on 28th Street and proceeded three blocks to Craig Street, where it turned right (west) for one block, then turned right (north) onto 28th Avenue, and then made a right turn (east) onto Sheffield Street. As the Chevelle turned the corner, the pickup was coming straight toward the Chevelle, causing it to swerve toward the curb. Both vehicles came to a stop with the driver's-side windows almost directly across from

each other.

According to Martin, she rolled down her window to find the defendant brandishing a gun and saying, "[Y]ou want to fuck with me[?]" Cook exited the Chevelle on the passenger side carrying a baseball bat. As Cook rounded the rear of the Chevelle, he was being followed by Perrigo, who testified that he had seen Anderson exit the pickup but that he did not see any firearms. Perrigo testified, as did Martin and Woods, that Cook had the bat in his hands at his side.

Perrigo's version is that Cook had the bat at his side and that one shot was fired, causing Cook to fall to the street. Cook started to stand back up and, according to Perrigo, was shot three more times by Anderson. Perrigo watched Anderson pick up the bat, which had rolled toward the curb; throw it into the bed of his pickup; and leave.

Martin testified that as Cook came around the rear of her automobile, Anderson was near the front tire and that Cook threw down the bat saying, "[I]t's cool," but Anderson started firing. She saw Cook hunch over, and then there was a pause of several seconds followed by more shots.

Woods, located in the rear of the Chevelle, also positioned Anderson near the front of the Chevelle and Cook near the rear. She testified that Cook had the bat in his right hand, but that before shots were fired he dropped it and said, "[H]ey, Dude, you know, it's all right," and then Anderson fired. Cook fell down, got back up, and was slouched over when two or three more shots were fired. Woods also testified that she saw Anderson exit the pickup with a large gun in his right hand, which was the one fired, and a small gun in his left hand.

Anderson testified that the two vehicles stopped near the corner of 28th Avenue and Sheffield Street, that he had stopped to "give them a piece of [his] mind," and that he then saw Cook come at him with a baseball bat. Anderson related that he had exited his vehicle with the .45-caliber automatic pistol in his right hand and had chambered a round when, within a matter of seconds, Cook swung the bat, striking the third and fourth fingers of the hand holding the pistol. Anderson testified that he backed up, telling Cook that "[t]his is not a joke, kid, you better stop," but that Cook prepared to swing again and

Anderson fired what he recalls as two shots, trying to hit the bat.

Anderson's .45-caliber pistol had a capacity of seven rounds. Two shell casings were recovered at the scene, and two were found in the back of Anderson's pickup. The weapon was found to have one round in the chamber plus two in the magazine. A .22-caliber Beretta pistol (a much smaller gun) owned by Anderson and recovered from his pickup following the shooting was fully loaded with seven rounds.

The post mortem examination of Cook revealed a through-and-through gunshot wound to the left hip and another to the left thigh, both of which Dr. Blaine Roffman, the pathologist, described as nonfatal. Another wound was caused by a bullet that entered the upper left chest, went through the lower portion of Cook's left lung, "tipped" his heart, and lodged in the spine. That bullet was recovered. Another wound was caused by a bullet that entered the left chest 5 inches from the armpit, passed through the stomach and the tip of the left kidney, and exited the body at the midback. These two wounds were both characterized as fatal by the pathologist. Dr. Roffman said that the direction of travel of these bullets was head to foot and left body to right body. Additionally, Cook had two through-and-through gunshot wounds through the left arm above the elbow, which the evidence suggests were made by two bullets passing through the arm before entering the chest.

### III. EVENTS PRECEDING THE SHOOTING

There is no challenge to the sufficiency of the evidence to support either conviction in this case. As a result, we normally would conclude our factual recitation at this point, as the evidence recited above is clearly sufficient to support the convictions. However, a major portion of this 9-day jury trial dealt with the events occurring in the Anderson neighborhood in the several weeks preceding the shooting. It is necessary to discuss that evidence in order to deal with Anderson's claim that the trial judge erred in not allowing Anderson to introduce into evidence his tape-recorded statement given to Omaha police officers at 6:25 a.m. on October 27, 1991, approximately 6 hours after the shooting. We therefore provide an abridged

version of this evidence.

Anderson's self-defense claim centered around evidence that his family was being terrorized by a group of youths which they said was a gang named "the East Omaha Rats." The trouble started when Anderson's wife, Vicky, and her son, Troy Schaal, attempted to intervene when a neighborhood resident, Doug Christian, was assaulted and beaten by Steve Hotz and Mike Gustafson, two alleged gang members, approximately 2 weeks prior to the shooting. In the course of this intervention, Vicky Anderson allegedly was struck by Gustafson. From this point forward, Anderson and his family described a pattern of harassment, intimidation, and terrorization by Gustafson, Hotz, and individuals who allegedly were their friends. This included repeated "drive bys" of the Anderson home with shouted threats and physical confrontations between Schaal and his friends and Hotz, Gustafson, and their friends. The Omaha police were called, and the Andersons made complaints to the city prosecutor's office.

Several days before the shooting, an altercation in a ShopKo parking lot led to a friend of Schaal's being injured. According to Anderson, the family was encouraged to secure information about the cars driving by which were harassing them and making threats to the family. There were also phone calls threatening the lives of Anderson and his wife. Anderson attributed all of these activities to the East Omaha Rats gang, and he attempted to secure license plate numbers and identities, although it appears clear that Gustafson and Hotz were known by the Andersons to be involved.

On October 25, the Friday night before this incident, Schaal and some of his friends, as well as Anderson, were outside the Anderson home standing in the street talking with other friends in a white van when a yellow Ford Fairmont reportedly came by, swerved, and struck two of Schaal's friends. Anderson gave chase in his pickup, and the police were ultimately called. Anderson testified that on that same evening, while he was out driving around, he encountered the Monte Carlo automobile which had been involved in the harassing and threatening drive bys. When that vehicle pulled into a driveway, it pulled in behind a blue Chevelle. However, Anderson testified that he

was unable to get a license plate number from the Chevelle.

On Saturday evening, October 26, Anderson apparently engaged in some coming and going from his residence, which he described as "[t]rying to keep a high profile. I was looking for these kids. If I found them, I was going to call in anything that would be of help because it certainly did make me nervous and I was quite concerned." During his driving about, he encountered the Monte Carlo, which had been stopped by the police. He had followed this vehicle the previous night. Anderson described the vehicle as being "one of them that had caused us so many problems and threatened our lives and just absolutely terrorized us to the point where my wife — my wife wouldn't leave the house." Apparently, there were two police cruisers present, and Anderson talked with one of the officers about the fact that the vehicle had been ticketed several nights earlier by Omaha police. However, he was told that the vehicle had been sold and that, therefore, nothing could be done. Heated words were apparently exchanged between Hotz and Anderson. At this time, Anderson had the two guns with him in his pickup, which guns have been described earlier.

Between 11 and 11:30 p.m., Anderson went to a neighborhood tavern, the Melibu Lounge, to meet an acquaintance and have a beer. Schaal had been home that evening with friends, and at about the same time, the group left to take one of the friends home. Vicky Anderson related that while Anderson was gone, she heard honking in the street, went to the door, and saw the cars which her son and his friends were driving pulling into the driveway. She also observed two cars, the Monte Carlo and an older dark gray or silver Cadillac El Dorado stop in the street. Approximately eight young males from those two vehicles chased Schaal and his friends into the yard, wielding bats and ax handles. A fight ensued, and Schaal was punched and beaten in the yard by a person he claimed to be Perrigo. Schaal was able to break away, get into the house, and get his 16-gauge shotgun. He returned to the porch with the shotgun and fired two shots into the air to disperse the attack. Meanwhile, Vicky Anderson had called 911 for help, as well as the Melibu Lounge for her husband to return. As the youths dispersed, verbal threats were made against the Anderson

family.

According to Vicky Anderson's testimony, her husband arrived home within 30 to 50 seconds of the end of the attack. She related that she could see a taillight of the Monte Carlo disappearing, but that the Cadillac was already out of sight. During a quick conversation about the condition of the family, Vicky Anderson saw a car go east on Reynolds Street. She pointed the vehicle out to her husband and told him that it was involved. Anderson saw that vehicle, which both of them said was a blue Chevelle, and he said that they "need[ed] that [license] plate number." He got into his pickup and left. At trial, Vicky Anderson testified that when the incident started at approximately 5 minutes past midnight, a blue Chevelle had driven past the house immediately before the two vehicles stopped to unload the armed assailants.

Anderson's defense centered around the allegations that the blue Chevelle was involved in the attack on the Anderson home as a "scout" vehicle, that it drove by after Anderson returned home, and that he gave chase to get the license plate number, which eventually led to the confrontation on 28th Avenue and Sheffield Street that resulted in Cook's death. The State's position was that Anderson's story was a fabrication made up to justify the confrontation. Vicky Anderson's trial testimony was impeached with her statement given on the morning of the shooting, wherein she did not refer to the blue Chevelle as the reason that her husband took off in pursuit, nor did she describe the presence of the blue Chevelle at the beginning of the incident. Schaal also failed to mention the Chevelle in his statement to the police.

## IV. STATE'S IMPEACHMENT OF ANDERSON

With the backdrop of the shooting itself and the contentions of the State and Anderson with respect to the blue Chevelle, we now turn to the State's impeachment of Anderson during cross-examination by his inconsistent statements. The preliminary questions from the prosecution were as follows:

Q. You were playing the games of the East Omaha Rats on Saturday night, weren't you?

A. What do you mean by that?

Q. You had decided to start wandering around and start chasing them, hadn't you?

A. No, not chase them.

After this exchange, the prosecution performed the appropriate preliminaries for use of the statement given by Anderson to Omaha police at 6:25 a.m. on October 27 and then read a portion of his statement:

Q. Do you recall this portion of your answer:

They were parked on the outside of the street and a yellow Fairmont came by and swerved back to the van into the group of people that were standing there including myself. I jumped in my truck. I ran them down and, again, the police couldn't do anything, even though this car had struck two of the kids. So I began to play their games. Instead of letting them chase me, I just wandered around and chased them a little bit.

Do you recall giving that answer to the police?

A. Yes, I do.

Q. You used the words, wander around and chase them a little bit, didn't you?

A. Through a migraine, yes, sir.

Q. Your explanation for making — for your choice of words at 6:25 in the morning is because you had a migraine?

A. Yes, sir. And I was up all night long and I had two broken fingers and some of it —

Q. You do acknowledge that you used those words: I just wandered around — I began to play their games. Instead of letting them chase me, I wandered around and chased them a little bit?

[Objection overruled.]

Q. . . . . You do acknowledge that that's what you said?

A. Yes, sir.

The record establishes that the trial court had sustained a motion in limine by the State to exclude the offer of the tape recording or the transcription of Anderson's statement to the police. At the close of all other evidence, Anderson made an offer of proof with respect to the tape, exhibit D, and the transcription thereof, exhibit E. The offer was that the actual

tape recording would be placed in evidence and played in its entirety to the jury with the jury having copies of the transcription to read along as it listened to the tape.

Counsel for Anderson stated that the tape was offered as an exception to the hearsay rule, since it was a prior statement consistent with Anderson's testimony and it was offered to rebut an express or implied charge against Anderson of recent fabrication. Furthermore, counsel stated that it was offered as an excited utterance exception to the hearsay rule and, under Neb. Evid. R. 803(2), Neb. Rev. Stat. § 27-803(2) (Reissue 1989), as a statement of the declarant's then existing state of mind, emotion, sensation, or physical condition. The prosecution objected that the statement was hearsay and renewed its objections from the motion in limine. The trial court ruled the statement inadmissible.

## V. ADMISSIBILITY OF ANDERSON'S STATEMENT

### 1. GENERAL PRINCIPLES OF ADMISSIBILITY

In *State v. Messersmith*, 238 Neb. 924, 936, 473 N.W.2d 83, 92 (1991), the Supreme Court held that the "admissibility of evidence is controlled by the Nebraska Evidence Rules, not judicial discretion, except in those instances under the Nebraska Evidence Rules when judicial discretion is a factor involved in admissibility of evidence." Neb. Evid. R. 803 contains the exceptions to the hearsay rule, and in our view, it is generally not discretionary except to the extent that Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 1989) (probative value substantially outweighed by danger of unfair prejudice, etc.), is a factor in determining admissibility.

### 2. EXCITED UTTERANCE

Neb. Evid. R. 802, Neb. Rev. Stat. § 27-802 (Reissue 1989), provides that "[h]earsay is not admissible except as provided by these rules or by other rules adopted by the statutes of the State of Nebraska." Commonly referred to as the "excited utterance" exception, Neb. Evid. R. 803(1) provides for the admissibility of "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

*State v. Plant*, 236 Neb. 317, 461 N.W.2d 253 (1990), provides guidance on the excited utterance exception. In that case, the out-of-court statement of Cindy Plant, the 4-year-old daughter of the defendant, was that her father had killed his 18-month-old stepson, Christopher Bartlett, by throwing him across the room. The statement was given to a police officer 2 days after the fatal injury. The court set forth the following three qualifications for an excited utterance: "(1) There must have been a startling event; (2) the statement must relate to the event; and (3) the statement must have been made by the declarant while under the stress of the event." *Id.* at 328, 461 N.W.2d at 263-64.

The tape recording of Anderson at 6:25 on the morning of the shooting satisfies the first two conditions. Obviously, the shooting qualifies as a startling event, and the tape recording clearly related to that event. Accordingly, we focus on the third condition, where we must consider whether the statement was made while under the stress of the event. The Supreme Court has determined that the "key requirement is that the statement be made without time for conscious reflection." *Id.* at 329, 461 N.W.2d at 264.

Although *Plant* dealt with the admissibility of a statement from a very young child in a child abuse case, reliance in the decision was placed on *People in Interest of O.E.P.*, 654 P.2d 312 (Colo. 1982), which said that the element of trustworthiness which underscores the excited utterance exception finds its source primarily in the " ' "lack of capacity to fabricate rather than the lack of time to fabricate." ' " *Plant*, 236 Neb. at 329, 461 N.W.2d at 264 (quoting *People in Interest of O.E.P., supra*).

The evidence in this case establishes that the shooting occurred shortly after midnight. Anderson was ultimately taken to the police station and first questioned by officers on an unrecorded basis. After that had been accomplished, the tape-recorded statement at issue was made. That statement is principally in narrative form by Anderson. Although *Plant* makes it clear that the passage of time between the startling event and the utterance is not determinative, we do not believe it can be ignored, particularly in the case of an adult, as opposed

to a young child, as was involved in *Plant*. In our view, $6^1/_2$ hours is clearly adequate time for Anderson to reflect upon and appreciate the seriousness of his situation and the potential consequences. There is simply no basis upon which to conclude that Anderson did not have the capacity to fabricate at 6:25 a.m. Thus, Anderson's tape-recorded statement, exhibit D, is not an excited utterance.

### 3. STATE OF MIND

The "state of mind" exception to the hearsay rule provides for the admissibility of

> [a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Neb. Evid. R. 803.

Anderson argues that the tape recording should have been played for the jury "so they could make a determination based on the language, the tone, the demeanor, the pace, the volume and the sound as to what the mental and physical state of the Defendant was at the time he gave the statement about which he was being cross-examined." Brief for appellant at 26-27. We disagree.

In *State v. Harrison*, 221 Neb. 521, 378 N.W.2d 199 (1985), the court made it clear that statements are not admissible under Neb. Evid. R. 803(2) "where they were offered as evidence of the defendant's state of mind at a time not material to the case." *Harrison*, 221 Neb. at 526, 378 N.W.2d at 203 (citing *State v. Rowe*, 210 Neb. 419, 315 N.W.2d 250 (1982); *State v. Pelton*, 197 Neb. 412, 249 N.W.2d 484 (1977)). In *Rowe*, insanity was used as a defense to murder. A psychiatrist had examined the defendant for purposes of trial testimony and made recordings of the defendant while he was under the influence of sodium amytal. The Supreme Court said:

> Such out-of-court statements are clearly not relevant to the issue of the defendant's mental state at the time of the

alleged crimes. While considerable latitude is permitted in the admission of evidence tending to show the mental condition of the accused when insanity is the defense, it must relate to the mental state of the accused at the time of the acts charged.

*Rowe*, 210 Neb. at 433-34, 315 N.W.2d at 259-60.

Even if the jury could reach meaningful conclusions about Anderson's state of mind from listening to the recorded statement, it is clear that his state of mind at the time of the statement is all that could possibly be gathered from the tape. This would likely be quite different from his state of mind when the confrontation occurred at 28th Avenue and Sheffield Street, and Anderson's state of mind at the time of the shooting, not at the time of the statement, is what is relevant. The state of mind exception to the hearsay rule provides no basis for the admission of the statement.

### 4. Prior Consistent Statement

Anderson argues that under Neb. Evid. R. 801(4)(a)(ii), Neb. Rev. Stat. § 27-801(4)(a)(ii) (Reissue 1989), the tape-recorded statement is not hearsay. Neb. Evid. R. 801(4)(a)(ii) provides that a statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive. This is often referred to as the "prior consistent statement" exception to the hearsay rule. As applied to this case, Anderson argues the tape recording should have been admitted to rebut the express or implied charge of recent fabrication made by the prosecution.

Neb. Evid. R. 801 was considered in *State v. Smith*, 241 Neb. 311, 488 N.W.2d 33 (1992), where a 13-year-old victim of sexual abuse had made a diary entry, which the Supreme Court determined to have been wrongfully admitted into evidence. In its discussion, the court made it clear that a prior consistent statement is to be accorded substantive use only if it is used to rebut an express or implied charge of recent fabrication, and therefore, " 'impeachment of the witness is a precondition.' "

*Id.* at 317, 488 N.W.2d at 37 (quoting 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence ¶ 801(d)(1)(B)[01] (1991)).

Perhaps a brief digression to consider impeachment would be helpful. In this regard, it is important to note that there is a difference between contradiction and impeachment and that the former is not needed before prior consistent statements may be used. As said by the Missouri Court of Appeals, "Impeachment is directed to a witness' credibility and ordinarily furnishes no additional factual evidence at trial," whereas contradiction, although used as a method of impeachment, "is directed to the accuracy of the witness' testimony and supplies additional factual evidence." See *Maugh v. Chrysler Corp.*, 818 S.W.2d 658, 661 (Mo. App. 1991).

Returning to *Smith*, the diary of the victim was admitted into evidence during her direct examination and before any evidence had been presented of an express or implied charge against her of recent fabrication. The Supreme Court held that the diary was inadmissible as a prior consistent statement, since it was not offered after "evidence had been presented implying that the victim was lying." *Smith*, 241 Neb. at 318, 488 N.W.2d at 37.

In the case before us, Anderson did not offer the tape-recorded statement until after all other evidence had been adduced. It seems clear that the prosecution had attacked Anderson's credibility, thereby satisfying the precondition of impeachment. The following is quoted from the State's cross-examination of Anderson:

Q. After you were at the scene for some period of time, you were taken to the police station, right?

A. Yes sir.

. . . .

Q. After all those things were done, what did they do with you?

A. Left me in a room.

. . . .

Q. Did you think about the events that had just transpired in the last few hours while you were in that room?

A. Of course.

Q. And you thought about that blue Chevelle, didn't you?

A. Not the Chevelle. I remember the bat.

Q. Huh?

A. I remember the bat. I remember the man attacking me with the bat.

Q. You didn't think to yourself that I better have some story about why I was following that blue Chevelle?

A. I was in no condition to do anything like that.

Q. You didn't think that you better have some story about why you left your home when you came home from the Melibu?

A. No, sir. I thought the truth would be good enough.

Q. Of course, you weren't allowed to speak with your wife while you were waiting in that room, were you?

A. No, sir.

Q. Or your son?

A. No, sir.

. . . .

Q. . . . You heard me ask your son, your wife and Tim Owens repeatedly about the fact that there's nothing on their taped statements about a blue Chevelle being involved in the incident that caused your wife to call you at the Melibu? Have you heard me ask them that?

A. I believe so.

It is clear to us that the impeachment need not be "successful" and that no matter how slight, if the seed is planted that the witness is not credible, then it can be said that, at the least, an implied charge of recent fabrication has occurred. Justice Shanahan referred to impeachment as the "sinister seed of innuendo" in *State v. Johnson*, 220 Neb. 392, 399, 370 N.W.2d 136, 141 (1985). The implication by the prosecution that Anderson was lying about the blue Chevelle being involved in the incident at his home as the reason that he chased it is inescapable. Furthermore, the prosecution, in its examination of Vicky Anderson, used her tape-recorded statement to the police to impeach her. At trial, Vicky Anderson testified that she and her husband had seen the blue Chevelle

one block from their home when he returned from the Melibu Lounge and that he left in pursuit to get the license plate number. The prosecution attacked her testimony with her statement from the night of the shooting, where she failed to say that her husband left in pursuit of the blue Chevelle. Accordingly, there is a substantial attack on Anderson's defense and his credibility by the prosecution's attempt to convince the jury that Anderson and his wife had fabricated the presence of the blue Chevelle at their house immediately after the attack upon the Anderson residence by armed youths.

Therefore, Anderson's purpose in putting the prior consistent statement into evidence is to establish that the prosecution is wrong when it charges that the Andersons contrived their testimony about seeing the blue Chevelle, since he described it in his tape-recorded statement. However, it is important to note that Anderson's tape-recorded statement was made $6^{1}/_{2}$ hours after the shooting had occurred. As such, it is necessary to consider whether a motive to fabricate or contrive may have already existed when Anderson's statement was taped. If so, it cannot be said that the number of times the same story is told, or when it is first told, makes similar trial testimony more believable.

By way of illustration, if, prior to the shooting, Anderson had said to a neighbor, "I must pursue that blue Chevelle to get its license plate number for the police," and if at trial Anderson so testified, but the prosecution assailed that as a fabrication, then the testimony of the neighbor regarding Anderson's prior consistent statement could be said to bear on the believability of the trial testimony, as well as being additional substantive evidence of why Anderson left in pursuit, because the statement was made before the shooting, when there was no motive for fabrication or contrivance. On the other hand, in this case, at the time Anderson made the statement, the shots had already been fired, Cook was mortally wounded or already dead, and Anderson had been arrested and was being questioned while in custody. Thus, he had ample reason and motive to contrive a version of the evening and morning events which was favorable to him. Therefore, what he said to the police officers in his tape-recorded statement does not necessarily bolster the

truthfulness of what he said while testifying at trial.

Our analysis is premised in part on *Johnson*, where the Supreme Court found that the prosecution had made the implication of deliberate falsehood in the trial testimony. The court said:

> If an attack on a witness' credibility through use of an inconsistent statement is accompanied by, or interpretable as, a charge of a plan or contrivance to give false testimony, proof of a prior consistent statement before the plan or contrivance was formed tends "strongly to disprove that the testimony was the result of contrivance. . . . It is for the judge to decide whether the impeachment amounts to a charge of contrivance, and ordinarily this is the most obvious implication." See McCormick on Evidence § 49 at 119-20 (E. Cleary 3d ed. 1984).

*Johnson*, 220 Neb. at 400-01, 370 N.W.2d at 142.

We note in this connection that prior to the enactment of the Nebraska Evidence Rules, prior consistent statements were not admissible as substantive corroborative evidence, but the adoption of Neb. Evid. R. 801 means that a prior consistent statement is not hearsay, and thus, when admissible, it is admissible as substantive evidence. See, *State v. Packett*, 206 Neb. 548, 294 N.W.2d 605 (1980); *State v. Gregory*, 220 Neb. 778, 371 N.W.2d 754 (1985).

Neb. Evid. R. 801 is patterned after Fed. R. Evid. 801. The U.S. Court of Appeals for the Eighth Circuit, in *United States v. Bowman*, 798 F.2d 333 (8th Cir. 1986), *cert. denied* 479 U.S. 1043, 107 S. Ct. 906, 93 L. Ed. 2d 856 (1987), considered the question of the admissibility of prior consistent statements and the purposes for which they can be admitted. The court acknowledged that there was considerable controversy between the federal circuits as to whether the prior consistent statements must be made independently of the alleged motive to fabricate before they can be admitted for substantive purposes. The Eighth Circuit joined the Second, Fourth, and Ninth Circuits in holding that "the better rule imposes a requirement that the consistent statements must come before the motive to fabricate existed." *Bowman*, 798 F.2d at 338.

The U.S. Court of Appeals for the Eighth Circuit followed

the reasoning that " 'mere repetition does not imply veracity.' " *Bowman*, 798 F.2d at 338 (quoting 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence ¶ 801(d)(1)(B)[01] (1981)). However, we note that the court in *Bowman* held that the prior consistent statements "were admissible for the purposes of rehabilitating the witness, even if not admissible for the truth of the matters asserted in those statements." *Bowman*, 798 F.2d at 338 (citing *United States v. Scholle*, 553 F.2d 1109 (8th Cir. 1977), *cert. denied* 434 U.S. 940, 98 S. Ct. 432, 54 L. Ed. 2d 300). We give some attention to *Scholle* because it is cited by the Nebraska Supreme Court in *Packett*. *Scholle* held that evidence of a prior consistent statement, even if made when the motive to fabricate existed, is admissible to allow the jury to evaluate the relative trustworthiness of the prior consistent statement as contrasted with an inconsistent statement. This matter is of some import, as *Johnson* does not discuss whether a statement should be admitted for rehabilitative purposes, i.e., is the witness credible, when it is otherwise inadmissible because the motive to fabricate was present when the statement was made.

In resolving this matter, we choose to be guided by what we consider to be a logical and commonsense approach which compels us to conclude that a prior consistent statement has no value as substantive evidence of the truth of its contents, nor as rehabilitation of the credibility of the witness, if it is made at a time when the witness clearly has a motive to fabricate. The probative value of what Anderson might have said to a neighbor before the shooting about chasing the blue Chevelle is obviously substantially different than what he says, in his own defense, after the shooting and his arrest. The former statement has some obvious elements of greater trustworthiness and reliability, whereas the statement made to the police about the blue Chevelle has no greater reliability or trustworthiness than what Anderson said directly to the jury during his in-court testimony, even if the statements are consistent, because the declarant's motive was the same at the time of the statement as at the time of the testimony.

The U.S. Court of Appeals for the Ninth Circuit has done much to aid our analysis of whether there should be different

rules of admissibility for substantive and rehabilitative use of prior consistent statements in *U.S. v. Miller*, 874 F.2d 1255 (9th Cir. 1989). That case involved an FBI agent charged with spying for the Soviet Union. Miller was charged with delivering classified documents to representatives of the Soviet Union. His defense was that he and a female codefendant, Svetlana Ogorodnikova, an immigrant from the Soviet Union, were seeking to penetrate the KGB on behalf of the FBI. At trial, the government impeached Ogorodnikova's testimony that Miller had never shown or given her a classified document. Miller's response was to attempt to introduce seven prior statements by Ogorodnikova to rehabilitate her under Fed. R. Evid. 801(d)(1)(B), identical to Neb. Evid. R. 801(4)(a)(ii). The trial court excluded Ogorodnikova's prior statements because they were all made after her arrest, when she clearly had a motive to fabricate.

The *Miller* court, citing *Breneman v. Kennecott Corp.*, 799 F.2d 470 (9th Cir. 1986), noted that the court of appeals had previously ruled that such prior statements were admissible as substantive evidence under Fed. R. Evid. 801(d)(1)(B) only if they were made before the witness had a motive to fabricate. The court cited *United States v. Brennan*, 798 F.2d 581 (2d Cir. 1986), and *United States v. Harris*, 761 F.2d 394 (7th Cir. 1985), and observed that both of those circuits had held that the requirement of no motive for fabrication did not apply when the prior consistent statement was offered solely for rehabilitation, rather than as substantive evidence. In disagreeing with *Harris* and *Brennan*, *Miller* initially pointed out that the requirement of no motivation to fabricate does not arise from the literal terms of Fed. R. Evid. 801, but, rather, emerges from the relevancy concerns under Fed. R. Evid. 402 and 403, identical to Neb. Evid. R. 402 and 403, Neb. Rev. Stat. §§ 27-402 and 27-403 (Reissue 1989).

The *Miller* court rejected the reasoning of *Harris* and *Brennan* on two grounds:

> First, since the requirement of no prior motive to fabricate is rooted in Rules 402 and 403, and not in the terms of Rule 801(d)(1)(B), there is no basis for limiting the requirement to cases involving prior statements under Rule

801(d)(1)(B). Indeed, we fail to see how a statement that has no probative value in rebutting a charge of "recent fabrication or improper influence or motive," *see* Fed.R.Evid. 801(d)(1)(B), could possibly have probative value for the assertedly more "limited" purpose of rehabilitating a witness. If "repetition does not imply veracity," *see Harris*, 761 F.2d at 399, then proof of repetition cannot rehabilitate.

Second, the distinction drawn by *Harris* and *Brennan* is inconsistent with the legislative history of Rule 801(d)(1)(B). Prior to the adoption of Rule 801(d)(1)(B), prior consistent statements were traditionally only admissible for the limited purpose of rebutting a charge of recent fabrication or improper influence or motive. *See* Fed.R.Evid. 801(d)(1)(B) advisory committee's notes. The Rule goes one step further than the common law and admits all such statements as substantive evidence. *Id*. The Rule thus does not change the type of statements that may be admitted; its only effect is to admit these statements as *substantive* evidence rather than solely for the purpose of rehabilitation. Accordingly, it no longer makes sense to speak of a prior consistent statement as being offered solely for the more limited purpose of rehabilitating a witness; any such statement is admissible as *substantive* evidence under Rule 801(d)(1)(B). In short, a prior consistent statement offered for rehabilitation is either admissible under Rule 801(d)(1)(B) or it is not admissible at all. The distinction drawn by *Brennan* and *Harris* is therefore untenable.

(Emphasis in original.) *U.S. v. Miller*, 874 F.2d 1255, 1272-73 (9th Cir. 1989).

Having said the foregoing, the court retreated slightly and refused to hold that the existence of a motive to fabricate at the time of the prior statement was an absolute and rigid bar to admissibility. Instead, the court concluded that under Fed. R. Evid. 402 and 403, a trial judge should consider motivation to fabricate as "one of several factors to be considered in determining relevancy—albeit a very crucial factor. Thus, the trial judge must evaluate whether, in light of the potentially

powerful motive to fabricate, the prior consistent statement has significant 'probative force bearing on credibility apart from mere repetition.' " *Miller*, 874 F.2d at 1274.

At this time, no Nebraska case has analyzed Neb. Evid. R. 801(4)(a)(ii) for a distinction between the use of a prior consistent statement for substantive purposes or for rehabilitation. It is clear from *Johnson* that if the motive to fabricate is present, the statement cannot be admitted for substantive purposes. With respect to whether a prior consistent statement should be admitted for so-called limited rehabilitation purposes, when there is a motive to fabricate present at the time it is made, we believe that the reasoning of the U.S. Court of Appeals for the Ninth Circuit is quite persuasive. Additionally, we believe that when a prior consistent statement is admitted for substantive purposes, whatever rehabilitative power the statement has will follow along and obviously be available to the trier of fact. ·

The motive for Anderson to fabricate was clearly present after Cook had been shot and Anderson had been arrested. It was in this context that the statement was made. Once the motive to fabricate, which can mean simply to place the best light or "spin" on his version of the events of the evening, was present, the fact that Anderson may have consistently told the same story (which may be all fabrication, all truth, or somewhere in between), did not enhance the credibility or weight of the trial testimony.

We are not inclined to adopt an interpretation of Neb. Evid. R. 801(4)(a)(ii) which would allow a defendant to "load up" his or her statements to the police and then place the prosecution in the position of having to forgo attacking the defendant's credibility at trial in order to avoid having the defendant place into evidence his or her self-serving statements. The fact that an accused denies robbing a liquor store on the day of his arrest, as well as 9 months later when he testifies before a jury, does not mean that his denial of guilt at trial is more likely true because he denied committing the robbery when he was initially interrogated upon arrest. We cannot say that one logically follows from the other.

To be relevant, evidence must be rationally related to an issue

by a likelihood, not just a mere possibility, of proving or disproving the issue to be decided. *State v. Coleman*, 239 Neb. 800, 478 N.W.2d 349 (1992). If relevancy is the rationale for exclusion of the prior consistent statement made when the motive to fabricate existed, as we now hold, then we believe that the U.S. Court of Appeals for the Ninth Circuit was also correct when it held that there may be some circumstances where the prior consistent statement has significant " 'probative force bearing on credibility apart from mere repetition.' " *Miller*, 874 F.2d at 1274. However, such circumstances are not present here. In so concluding, we believe it appropriate to place several matters in context. Clearly, the defense wanted the jury to believe that the blue Chevelle was involved in the attack upon the Anderson residence and was seen by both Anderson and his wife immediately thereafter, causing Anderson to chase it to get the license plate number. However, the defense's problem was not inconsistency between Anderson's statements about the blue Chevelle when interrogated at 6:25 on the morning of the shooting and his trial testimony, but, rather, that Vicky Anderson's trial testimony was inconsistent with her tape-recorded statement given to the police. She had not told the police in that statement on the morning of the shooting that her husband had left to go follow a blue Chevelle to get a license plate number, whereas at trial, she said that he did. Additionally, in trial testimony in response to her husband's attorney's questions, she testified that immediately before the attack, she heard horns honking and that she looked out and saw the blue Chevelle going past the Anderson residence just before the Monte Carlo and the Cadillac stopped and unloaded the assailants. However, that information was not in her tape-recorded statement to the police. Consequently, a portion of the prosecution's examination of her was as follows:

Q. . . . You didn't tell him [the police officer] every little thing about the blue Chevelle because when your husband came back and said he shot somebody, you thought he shot Gustafson or Hotz or somebody in that Cadillac or that Monte Carlo; isn't that right?

A. That's not true.

Q. And isn't it also right that it's only later that you

found out a blue Chevelle was involved and you had to make up something about a blue Chevelle being at your house that night?

A. That's not true.

Q. Your husband shot the wrong man, didn't he, Mrs. Anderson?

A. No, he did not.

The reality of the matter is that it was Vicky Anderson who was impeached with prior contradictory and inconsistent statements, and thus, Anderson sought to use his own prior statement as a vehicle to rehabilitate her testimony. However, if his statement is not admissible because it was given when a motive to fabricate existed, then it cannot be used for the different and purportedly limited purpose of rehabilitation of another witness. Anderson also argues that he should have been allowed to play the entire recording so that the jury could hear his tone, gauge his emotional state, and thereby understand the truth of his trial testimony that his choice of words that he was chasing the gang members or playing their game was a poor choice of words due to a migraine headache. Putting aside the other impediments to admissibility which we have found and discussed, Anderson did not say at the time of the tape-recorded statement that he had a migraine, and thus, it simply was not a prior consistent statement in this regard. Additionally, Anderson cites no authority, nor have we found any, which would allow the jury to hear a tape recording of a voice and then draw a medical conclusion that the speaker was suffering from a migraine. In conclusion, we hold that the district court did not err in refusing to allow Anderson's tape-recorded statement into evidence to be played to the jury.

## VI. JURY INSTRUCTIONS ON MANSLAUGHTER

Anderson, the prosecution, and the court were in agreement that a proper factual basis existed for submission to the jury of first degree murder and the lesser-included offenses of second degree murder and manslaughter. Thus, the jury was instructed on first degree murder and the two lesser-included offenses. However, at the instruction conference, Anderson objected because the elements of voluntary and involuntary

manslaughter were not listed separately. The court overruled that objection and instructed the jury as follows:

> The material elements which the State must prove by evidence beyond a reasonable doubt in order to convict the Defendant of the crime of manslaughter are:
>
> 1. That Defendant Allan L. Anderson, on or about October 27, 1991, did kill Virgil Cook;
>
> 2. That he did so in Douglas County, Nebraska;
>
> 3. That the Defendant killed Virgil Cook without malice, either intentionally upon a sudden quarrel, or unintentionally while in the commission of an unlawful act, such as an assault on Virgil Cook.

Anderson now argues that the court committed prejudicial error in failing to separate the elements of voluntary and involuntary manslaughter. Anderson's theory is that he was entitled to have the jury reach a unanimous verdict on whether the crime was involuntary manslaughter or voluntary manslaughter. There is no citation of authority to support this proposition, which Anderson asserts is based upon his due process rights under the 14th Amendment to the U.S. Constitution.

On the other hand, the State points out that a similar contention has been resolved adversely to Anderson by the U.S. Supreme Court in *Schad v. Arizona*, _____ U.S. _____, 111 S. Ct. 2491, 115 L. Ed. 2d 555 (1991). In that case, the defendant was tried on theories of premeditated murder and felony murder, either of which, the jury was told, would constitute first degree murder. Five members of the Court did not believe that the Due Process Clause had been violated by the trial court's failure to require the jury to come to unanimous agreement on whether the act was premeditated murder or felony murder. Justice Souter, writing for four members of the Court, said: "We see no reason . . . why the rule that the jury need not agree as to mere means of satisfying the *actus reus* element of an offense should not apply equally to alternative means of satisfying the element of *mens rea*." 111 S. Ct. at 2497. The Court nonetheless recognized that the differences between means to commit a crime may become so important that they may not "reasonably be viewed as alternatives to a common

end, but must be treated as differentiating what the Constitution requires to be treated as separate offenses." 111 S. Ct. at 2498.

The manslaughter statute provides that "[a] person commits manslaughter if he kills another without malice, either upon a sudden quarrel, or causes the death of another unintentionally while in the commission of an unlawful act." § 28-305. The definitive interpretation of that statute is found in *State v. Pettit*, 233 Neb. 436, 453-54, 445 N.W.2d 890, 901 (1989), where the court held that § 28-305(1)

> establishes and distinguishes the two categories of manslaughter: an unlawful killing, without malice "upon a sudden quarrel," which may be characterized as voluntary manslaughter, and an unlawful but unintentional killing, without malice, as the result of the defendant's commission of an unlawful act, which may be characterized as involuntary manslaughter.

The fundamental question to be resolved in *Pettit* was whether the State was required to prove that the defendant intended to kill in order to sustain a conviction for voluntary manslaughter, i.e., a conviction for killing another without malice upon a sudden quarrel. The court held that proof that the defendant intended to kill is, in fact, a necessary element of voluntary manslaughter, whereas an unintentional killing while in the commission of an unlawful act is also manslaughter. It is clear that the instruction given by the trial court incorporated the holding of *Pettit* into paragraph 3 of the instruction quoted above.

Section 28-305(2) states that manslaughter is a Class III felony. *Pettit* makes it clear that there are two ways to commit manslaughter. *State v. Parker*, 221 Neb. 570, 379 N.W.2d 259 (1986), holds that when a single crime may be committed under a number of different theories, the defendant is not entitled to an instruction that in order for the defendant to be found guilty, the jury must be unanimous with regard to any one theory or the jury must find the defendant not guilty. Parker was found guilty of operating a motor vehicle while under the influence under Neb. Rev. Stat. § 39-669.07 (Reissue 1984), and the complaint charged that he operated the vehicle while under the

influence of alcoholic liquor *or* drugs *or* while he had .10 percent or more by weight of alcohol in his body fluid. In rejecting Parker's argument, the court observed that he had failed to distinguish between the offense itself and various theories upon which proof of the offense may be established. The Supreme Court relied upon an Iowa Supreme Court case dealing with a similar operating a motor vehicle while under the influence statute. In that case, the Iowa court said that the statute defined " 'a single offense committable in alternative ways rather than multiple offenses.' " *Parker*, 221 Neb. at 572, 379 N.W.2d at 261 (quoting *State v. Bratthauer*, 354 N.W.2d 774 (Iowa 1984)). Accordingly, the Supreme Court in *Parker* found that it did not matter whether some of the jurors believed that Parker was operating a motor vehicle while impaired by alcohol, while others believed that he had .10 percent or more by weight of alcohol in his body fluid.

The Legislature has seen fit to make manslaughter a Class III felony punishable by a minimum of 1 year's imprisonment and a maximum of 20 years' imprisonment, a $25,000 fine, or both. Under the legislative scheme, it matters not for penalty purposes whether the crime is voluntary manslaughter or involuntary manslaughter. Manslaughter is one crime which may be committed in two ways. Due process requires only that the jury unanimously agree on whether the crime has been committed, and Anderson was not entitled to an instruction which separated voluntary and involuntary manslaughter or required unanimity by the jury with respect to whether it was voluntary or involuntary manslaughter. The assignment of error is without merit.

## VII. EXCESSIVE SENTENCES

Anderson assigns error on the basis that the district court imposed excessive sentences. A sentence of 4 to 6 years' imprisonment was imposed for the manslaughter conviction, and a consecutive sentence of 4 to 6 years' imprisonment was imposed for the use of the weapon conviction. Section 28-1205(3) makes it mandatory that a sentence imposed for the use of a firearm to commit any felony "shall be consecutive to any other sentence imposed." Accordingly, the fact that

consecutive sentences were imposed is not erroneous and was mandated by the applicable statute.

Both crimes of which Anderson was convicted are Class III felonies requiring a minimum of 1 year in prison and a maximum of 20 years in prison. The sentences are within the statutory limits. A sentence imposed within statutory limits will be affirmed on appeal in the absence of an abuse of discretion. See *State v. Philipps*, 242 Neb. 894, 496 N.W.2d 874 (1993). Lesser sentences would depreciate the seriousness of the crime.

Accordingly, we affirm Anderson's convictions and sentences.

AFFIRMED.